# EXHIBIT 6

STUART B. KLEINMAN, M.D.

1623 3rd Avenue

Suite 203

New York, NY 10128

- - -

Telephone (917) 441 7500

**UPDATED FORENSIC PSYCHIATRIC REPORT:** Regarding Vivian Xiang, date of birth, ▮▮▮▮ 1982, Case # 19-CV-1752 (PAE), prepared at the request of Morrison Cohen LLP, attorneys Keith Markel and Theresa D'Andrea, on March 24, 2021.

Xiang Updated Forensic Psychiatric Report
March 24, 2021
Stuart B. Kleinman, M.D.

## TABLE OF CONTENTS:

Sources Of Data                                                                 3

Forensic Psychiatric Issue                                                      4

Parameters Of Opinion                                                           4

Forensic Psychiatric Analysis                                                   5

     Lack of, Or Significantly Inadequate, Examination

     Of Symptoms Or Difficulties Which Ms. Xiang

     Identified On Self-Report Instruments That Dr. Frankel

     Provided To Her                                            8

     Lack Of, Or Significantly Inadequate, Examination

     Of Stressors Other Than The Alleged Discrimination        10

     Lack Of Examination Of Important Or Potentially

     Important Indicia Of Mental State Identified In Mental

     Health Treatment Records Of Dr. Jason                      12

     Lack Of, Or Significantly Inadequate, Assessment Of

     The Nature And Origins Of Ms. Xiang's Reported

     Difficulties During Dr. Frankel's Examination             20

     Lack Of Use Of Adequate Analytic Methodology

     To Assess Causation                                        25

Forensic Psychiatric Conclusion                                                29

Xiang Updated Forensic Psychiatric Report
March 24, 2021
Stuart B. Kleinman, M.D.

**<u>SOURCES OF DATA:</u>**

1.      Deposition testimony of Gladys Frankel, Ph.D, of February 5, 2021.

2.      Email correspondence between Ms. Xiang and Dr. Frankel of June 4 to 5, 2020.

3.      The sources of data identified in the evaluator's report of February 4, 2021.

## FORENSIC PSYCHIATRIC ISSUE:

Did the evaluation methodology that Dr. Frankel used to assess Ms. Xiang permit her to render a reliable opinion regarding the nature, magnitude, duration, and causation of Ms. Xiang's reported emotional distress?

## PARAMETERS OF OPINION:

This evaluator has not examined Ms. Xiang, and does not offer a diagnosis of her mental state or any conclusions regarding the specific psychological impact of the discrimination that she alleges. Rather, this evaluator addresses the reliability, within the forensic-litigation context in which Dr. Frankel assessed Ms. Xiang, of the evaluation methodology that her affidavit/report, deposition testimony, and other data indicate she utilized in forming her conclusions regarding Ms. Xiang.

## **FORENSIC PSYCHIATRIC ANALYSIS:**

The totality of the data that this evaluator has reviewed indicates that Dr. Frankel did not utilize reliable forensic evaluation methodology in assessing Ms. Xiang's reported emotional distress. The following summarize the primary factors that render the evaluation methodology which Dr. Frankel employed insufficient to permit formation of reliable conclusions regarding Ms. Xiang's reported emotional distress:

1.      Lack of, or significantly inadequate:

    A.      Examination of:

        i.      Reported manifestations of distress, including potential manifestations of:

            a.      Posttraumatic distress;

            b.      Clinically significant anxiety; and

            c.      Clinically significant depression.

        ii.     The presence, magnitude, and duration of the reported symptoms of the disorders with which Dr. Frankel diagnosed Ms. Xiang.

        iii.    The potential or suggested presence of stressors other than the alleged discrimination, and their role in causing Ms. Xiang's reported distress.

        iv.     The potential or suggested presence of pre-existing or other psychiatric difficulties that may contribute to producing Ms. Xiang's reported distress.

    B.      Review of records to determine, including corroborate, the: 1) presence, magnitude, and duration, and 2) origin, of Ms.

Xiang's reported distress.

Reliable corroboration of the presence, magnitude, duration, and origin of a forensic evaluee's reported distress constitutes a standard and essential component of forensic mental health assessment of claimed emotional distress damages.

Dr. Frankel additionally failed to utilize the one collateral, non-examination based source of mental health data that she obtained, i.e., treatment records of the psychologist, Dr. Jason.

> Although the data in Dr. Jason's records were obtained independently of the examination which Dr. Frankel conducted, Ms. Xiang's engagement in litigation also potentially influenced how she related information to Dr. Jason.

C.   Database for forming an even preliminary reliable opinion regarding any impact of Ms. Xiang's reported distress upon the future development of her son.

2.   Reliance upon:

A.   Psychological instruments that are inherently unreliable when used within the context of adversarial litigation.

B.   A single instrument to assess feigning, which does not address feigning of the depression and anxiety that Dr. Frankel concluded Ms. Xiang has experienced.

C.   Data generated from responses on psychological instruments

which are, at least in part, confounded by Ms. Xiang's lack of full adherence to these instruments' instructions.

Ms. Xiang self-administered the instruments that Dr. Frankel provided to her before she met with Dr. Frankel, and Dr. Frankel did not subsequently review with her whether or to what extent she complied with the instruments' instructions. The nature of a number of Ms. Xiang's responses, together with her deposition testimony, indicate that she did not consistently limit her answers regarding the presence of symptoms to time periods she was specifically asked to address.

D.    A psychological instrument, i.e., the PTSD Symptom Scale – Interview for DSM-5 (PSS-I-5), which was not an appropriate tool for assessing Ms. Xiang's mental state.

The alleged discrimination was not a life event which may produce a Posttraumatic Stress Disorder (PTSD). It did not constitute the type of event to which the <u>Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition</u> (DSM-V), requires exposure for the potential generation of a PTSD. Consequently, the PSS-I-5 should not have been used in assessing Ms. Xiang's mental state.

The DSM-V is published by the American Psychiatric Association.

## Lack Of, Or Significantly Inadequate, Examination Of Symptoms Or Difficulties Which Ms. Xiang Identified On Self-Report Instruments That Dr. Frankel Provided To Her:

Dr. Frankel's deposition testimony indicates that she, for example, did not specifically address, or inadequately addressed, the presence or magnitude of the following difficulties which Ms. Xiang identified on the self-report instruments that she completed:

1.  The diminished sleep which Ms. Xiang reported on the Beck Depression Inventory-II (BDI-II).

    Dr. Frankel testified:

    > "Q.   Do you see the next section is 'Changes in Sleeping Pattern'?
    >
    > A.   Yes.
    >
    > Q.   And do you see she circled '(2b) I sleep a lot less than usual'?
    >
    > A.   Yes.
    >
    > Q.   Did you ask her how many hours of sleep a night she gets?
    >
    > A.   I'd have to go back to my report to look.
    >
    > Q.   Does it reflect in your report anything about the hours of sleep Ms. Xiang gets at night?
    >
    > A.   No, I don't think so.
    >
    > Q.   Did you ask her how many hours of sleep she got before she was let go from Market America?
    >
    > A.   No."

2.      The trouble concentrating which Ms. Xiang reported on the BDI-II.

Dr. Frankel testified:

> "Q.    Do you see the next section is 'Concentration
>         Difficulty'?
>
> A.    Yes.
>
> Q.    Do you see she circled '(1) I can't concentrate as well as
>         usual'?
>
> A.    Yes.
>
> Q.    Did you ask her what she was referring to?
>
> A.    No.
>
> Q.    Did [*sic*] ask her whether or not she was having any
>         problems at work concentrating?
>
> A.    No.
>
> Q.    Did you ask Ms. Xiang whether or not she had any
>         performance issues at her job as of June 2020?
>
> A.    No."

3.      The diminished interest in sex which Ms. Xiang reported on the BDI-
II.

Dr. Frankel testified:

> "Q.    Do you see she circled '(2) I'm much less interested in
>         sex now'?
>
> A.    Yes.
>
> Q.    Did you ask Ms. Xiang about that?
>
> A.    No.

> Q.     Did you ask Ms. Xiang about her relationship with her husband?
>
> A.     No."

## Lack Of, Or Significantly Inadequate, Examination Of Stressors Other Than The Alleged Discrimination:

Ms. Xiang identified or suggestively indicated in responses to self-report instrument inquiries the presence of sources of distress which Dr. Frankel did not explore or inadequately explored when she examined Ms. Xiang. Dr. Frankel's following deposition testimony, for example, illustrates such:

1.     "Q.     Do you see question 20 says 'Marriage…' and she writes 'sucks'?

       A.     Yes.

       Q.     Did you probe why she felt marriage sucks?

       A.     No.

       Q.     Did you talk about her marriage with her husband?

       A.     No.

       Q.     Did you discuss whether or not her and her husband had any marital problems?

       A.     No.

       Q.     Did you ask Ms. Xiang whether or not she was in marriage counseling?

       A.     No."

Xiang Updated Forensic Psychiatric Report
March 24, 2021
Stuart B. Kleinman, M.D.

-------------------------------------------------------------------

"Q.    Do you see in question 34 –

MR. MARKEL: Ross, if you could go to the next

page --

Q.    -- it says 'The worst thing a man can do to

A woman is…' and she writes 'is

cheating.' Did you discuss that with her?

A.    No.

Q.    Do you know whether or not her husband

ever cheated on her?

A.    I do not know.

Q.    Did you ask her whether or not anyone had

ever been unfaithful to her?

A.    I did not ask her."


2.        "Q.    Do you see question 18, it asks 'I wish…' and she

writes 'COVID-19 can be over soon'?

A.    Yes.

Q.    Did you ask her about what she meant by that?

A.    No.

Q.    Does her response suggest that she was anxious about

COVID-19?

A.    No.

Q.    What does her response suggest to you?

A.    She said she'd like it to be over, as does every other

person in the world."

The above referenced, numbered questions regard Ms. Xiang's responses on the Rotter Incomplete Sentences Blank, an instrument that Dr. Frankel provided to her.

Similarly, Dr. Frankel did not investigate the potential presence of longstanding personality features that may create problematic irritability, a difficulty that Ms. Xiang has attributed to the alleged discrimination.

Dr. Frankel testified regarding Ms. Xiang's response to an additional item on the Rotter Incomplete Sentences Blank:

> "Q.    Forty-two, the question says 'My personality would be much better if…' and then she writes 'I don't get angry or anxious so easily.'
>
> A.    I see that.
>
> Q.    Did you ask her why she got angry so easily?
>
> A.    No."

**<u>Lack Of Examination Of Important Or Potentially Important Indicia Of Mental State Identified In Mental Health Treatment Records of Dr. Jason:</u>**

Dr. Frankel testified:

> "Q.    Did you ask Ms. Xiang any questions whatsoever about the notes you received of Dr. Jason?
>
> A.    No."

Dr. Frankel, for example, did not investigate:

1.      A generally important indicator of psychological well-being, i.e. vocational functioning, that is referenced in Dr. Jason's records.

Dr. Frankel testified:

A.       "Q.      Did you see in the 'Relevant Content' section, it says 'Currently working as a freelancer'?

A.      Yes.

Q.      Did you discuss that with Ms. Xiang?

A.      No.

Q.      Did you discuss with Ms. Xiang that she had found new employment?

A.      I don't recall.

Q.      As you sit here today and review this document, is it your understanding that as of December 19th, 2018, Ms. Xiang was employed?

A.      That is what the document is suggesting.

Q.      But you didn't explore with Ms. Xiang when you met with her on June 5th, 2020 whether or not she was employed, correct?

A.      Correct."


B.       "Q.      Dr. Frankel, do you see that this reflects that Ms. Xiang missed an appointment with Dr. Jason on April 12th, 2019?

13

A.    Yes.

Q.    Do you know why Ms. Xiang missed her appointment?

A.    I do not know why. The report has a comment.

Q.    What is that comment?

A.    'Had to stay late at work.'

Q.    Does that reflect that Ms. Xiang was employed as of April 12th, 2019?

MR. ALTARAS:    Objection.

A.    It reflects what Dr. Jason wrote.

Q.    And what did Dr. Jason write?

MR. ALTARAS:    Objection.

A.    'Had to stay late at work.'

Q.    Does that suggest to you, sitting here today, that as of April 12th, 2019 Ms. Xiang was employed?

A.    No.

Q.    So do you think this note from Dr. Jason is inaccurate?

A.    No.

Q.    Do you think that Ms. Xiang was lying about having to stay late at work?

MR. ALTARAS:    Objection.

A.    This is what Dr. Jason wrote.

Q.    Do you have any reason to believe that what Dr. Jason wrote is not true?

A.    No.

14

Q.    So why do you believe that Ms. Xiang was not

employed as of April 12th, 2019?

A.    I don't have information directly from the client

about that particular date.

Q.    That's because you didn't ask Ms. Xiang whether

or not she was employed as of April 12th, 2019,

correct?

MR. ALTARAS:    Objection.

A.    Correct."


C.    "Q.    Do you know that Ms. Xiang was employed

as of December 2018?

A.    I do not have that specific information.

Q.    Do you know that Ms. Xiang was employed as of

June 5th, 2020 when you interviewed her?

MR. ALTARAS:    Objection.

A.    I would need to go and look at that.

Q.    What would you need to look at?

A.    If there are -- in some cases, we talk about how the

effects of a prior work

experience impact a current work experience.

Q.    My question to you is Ms. Xiang,

whether or not she was employed when you

interviewed her?

A.    No.

Q.    Wouldn't that have been relevant to you?

A.    No.

Q.    Why not?

A.    Well, I want to focus on her

emotional experiences at the moment.

Q.    As of June 5th, 2020?

A.    Yes."


D.        "Q.    So would it surprise you to know as of June 5th,

2020 that Ms. Xiang was actually employed?

MR. ALTARAS:        Objection.

A.    She could be employed as someone with very little

income.

Q.    Do you know that Ms. Xiang was employed in a

role that paid her approximately $10,000 more

than she made at Market America?

MR. ALTARAS:        Objection.

A.     I do not have income information.

Q.    Did you ask Ms. Xiang whether or not she made

more money at her new job than her job when she

was employed at Market America?

A.     No."


2.    Independent stressors that are referenced in Dr. Jason's records.

Dr. Frankel, for example, testified:

A.        "Q.    Wouldn't it have been important for

you to know whether or not there were independent

stressors that Ms. Xiang was experiencing for purposes of your examination of Ms. Xiang?

MR. ALTARAS:    Objection.

You can answer if you understand the question.

A.    Yes.

Q.    Do you see the sentence says after 'Stresses at home as well, daughter just bit someone in day care again'?

A.    Yes.

Q.    Do you see that?

A.    Yes.

Q.    Did you discuss with Ms. Xiang what her -- withdrawn.

Did you discuss with Ms. Xiang her daughter biting other children in day care?

A.    No."


B.    "Q.    Do you see also in that same 'Relevant Content' section that it refers to a 'conflict with her mother who lives with them'?

A.    Yes.

Q.    Did you explore with Ms. Xiang any conflicts she was having with her mother?

A.    No.

Q.    Did you explore any conflicts that Ms. Xiang was having with her mother-in-law?

        A.     No.

        Q.     Did you explore any conflicts that Ms. Xiang was having with her husband?

        A.     No."

C.       "Q.     Do you see in that same section it says 'Difficulty between her mother and mother-in-law, as they have conflict'? Do you see that?

        A.     Yes.

        Q.     Did you explore with Ms. Xiang the conflict between her mother and mother-in-law?

        A.     No.

        Q.     Did you explore with Ms. Xiang whether or not she suffered any anxiety over the conflict between her mother and mother-in-law?

        A.     No.

        Q.     Did you explore with Ms. Xiang whether or not she felt depressed because of the conflict between her mother and mother-in-law?

        A.     No.

        Q.     Do you see in that same section it refers to 'supporting positive communication in ways in which to manage the various stressors'?

        A.     Yes.

        Q.     Did you discuss with Ms. Xiang what

the various stressors were?

A.    No."

D.        "Q.    Do you see in the 'Relevant Content' section
                it says 'Dealing with two kids is difficult'?

        A.    Yes.

        Q.    Did you address with Ms. Xiang why she felt
                dealing with two kids was difficult?

        A.    No.

        Q.    Did you discuss with Ms. Xiang her ability
                to cope with having two children?

        A.    No."


3.  A suggested indicator of improvement of mental state or well-
    being that Dr. Jason's records contain.

    Dr. Frankel testified:

        "Q.    Do you know that Ms. Xiang never saw

                Dr. Jason from March 22nd, 2019 until June 3rd *[sic]*,

                2020?

        A.    Ms. Xiang indicated to me that there

                was a hiatus.

        Q.    Did she indicate to you that it was a 15-month hiatus?

        A.    We did not speak about -- you're using 15 months

                specifically.

        Q.    Ms. Xiang never saw Dr. Jason from

                March 22nd, 2019 until June 30, 2020, correct?

19

MR. ALTARAS:      Objection.

A.      We are utilizing the progress notes to provide

that information.

Q.      I'm sorry? I didn't hear that.

A.      I said we're using the progress notes to reflect the

question you're asking me to answer."

## Lack Of, Or Significantly Inadequate, Assessment Of The Nature And Origins Of Ms. Xiang's Reported Difficulties During Dr. Frankel's Examination:

Dr. Frankel did not make necessary or sufficient inquiries to be able to reliably assess: 1) whether or to what extent Ms. Xiang experienced phenomena reflecting the presence of a mental disorder or disorders, or 2) all of the sources of any such disorder or disorders.

Dr. Frankel testified regarding:

1.      Her assessment of nightmares:

"Q.      Do you recall referencing Ms. Xiang having any bad dreams or nightmares as a result of being let go from Market America?

A.      I believe she more responded that the experience was a nightmare.

Q.      But Ms. Xiang never told you she had any dreams or nightmares as it relates to this form or question, correct?

A.      Correct."

Characterizing an event as a "nightmare" is distinctly different than suffering nightmares of an event.

The above-referenced "form or question" relates to an item on the PSS-I-5.

2.    Her assessment of dissociative re-living, i.e., 'flashbacks,' and other reliving phenomena.

Dr. Frankel testified:

> "Q.    The next question [on the PSS-I-5] is 'Have you had the experience of suddenly reliving the trauma, flashbacks of it, acting or feeling as if it were recurring?'
>
> Did you discuss the fact that she put a two next to this?
>
> MR. ALTARAS:    Objection.
>
> A.    When she said it was like -- talking to Dan about the forthcoming mediation, she said it was like opening the box again.
>
> Q.    Did you ask her how many times a week she felt trauma or distress as a result of that?
>
> MR. ALTARAS:    Objection.
>
> A.    No."

Remembering a disturbing event when directly exposed to a specific reminder of it does not inherently reflect the presence of a pathological phenomenon, i.e., symptom of a mental disorder. To establish whether such type of reactions do so, it is necessary to specifically (and reliably) ascertain the characteristics of any

21

'reliving' phenomena an individual may experience.

3.      Her assessment of Ms. Xiang's family psychiatric history.

Dr. Frankel testified:

> "Q.    Did you take any psychiatric history of her family at all?
>
> A.     No.
>
> Q.     Why not?
>
> A.     I wanted to focus on her emotional consequences of her experiences at work.
>
> Q.     Wouldn't it be important to know whether or not her family had suffered from any mental illnesses?
>
> MR. ALTARAS:       Objection.
>
> A.     It's additional information, but we look at the patient, the client specifically and look at her behavior.
>
> Q.     Wouldn't it be important to know the mental health history of her family when evaluating a patient?
>
> A.     As I said, I stick to the patient and what her behavior is expressing."

Dr. Frankel additionally grossly inadequately investigated data fundamentally important to assessment of the development and health of Ms. Xiang's son.

Dr. Frankel, for example, testified:

1.       "Q.       Do you know whether or not her baby has achieved all of his milestones?

MR. ALTARAS:       Objection.

A.    No.

Q.    Do you know whether or not her baby
has suffered any disabilities?

MR. ALTARAS:    Objection.

A.    No.

Q.    Did you speak to Ms. Xiang's children's
pediatricians?

A.    No.

Q.    Did you ask Ms. Xiang for any medical
history with respect to her children?

A.    No.

Q.    Did you ask Ms. Xiang to obtain any
documents from any of her children's
doctors?

A.    No."

2.    "Q.    Did you ask her how much weight she gained
during her pregnancy?

A.    No."

-------------------------------------------------------------------------

"Q.    Did you know that Ms. Xiang had another child?

A.    I don't recall at the moment."

-------------------------------------------------------------------------

"Q.    Did you discuss with Ms. Xiang her first
pregnancy?

A.    No.

Q.      Did you discuss with Ms. Xiang that she was
        pregnant with her first child in 2016?

A.      No."

-------------------------------------------------------------------------

"Q.     Did you ask Ms. Xiang how much weight she had
        gained during her first pregnancy?

A.      No.

Q.      Did you ask Ms. Xiang how much weight she had
        gained at the same point in her first pregnancy as
        her second pregnancy?

A.      No."

Email correspondence between Dr. Frankel and Ms. Xiang that the
evaluator reviewed indicates that Dr. Frankel examined Ms. Xiang for
a total of approximately one hour. Such an amount of time was
insufficient for obtaining and investigating the information needed for
reliable assessment of any psychiatric difficulties that Ms. Xiang has
suffered.

The same email correspondence also indicates that Dr. Frankel only
first obtained treatment records of Dr. Jason after she examined Ms.
Xiang. Typically, mental health data such as those contained in mental
health treatment records help inform and enhance the utility of direct
forensic mental health examination.

## Lack Of Use Of Adequate Analytic Methodology To Assess Causation:

It is a standard and essential component of forensic mental health assessment of causation of claimed emotional distress damages to investigate the presence and evaluate the impact of stressors other than a legally claimed cause of such distress. Lack of adequate evaluation of such (independent) stressors generally prevents reliable determination of causation.

Dr. Frankel described in her deposition testimony not considering or largely not considering the role of any stressors which Ms. Xiang has experienced since she lost her position with Market America in her analysis of causation of the psychiatric difficulties with which she has diagnosed Ms. Xiang. She testified:

1.  "Q.    Wouldn't it have been important for you to know what those multiple stressors were that Ms. Xiang was suffering from in 2018?

    MR. ALTARAS:        Objection.

    A.    As I said, the stressors from 2018 can be different than 2019.

    Q.    Wouldn't it have been important to you to know that since Ms. Xiang left Market America in July 2018 what stressors she's experienced since that date?

    MR. ALTARAS:        Objection.

    A.    We focused on her experiences during her work. During work.

    Q.    You focused on her stressors during work while she was at Market America?

    A.    We focused on the emotional consequences from those

25

experiences being terminated when she was pregnant."

2.    "Q.    Wouldn't it have been important to know whether or not
        Ms. Xiang was suffering from various stressors?

A.    No.

Q.    Why not?

A.    Well, people can have many stressors. It's a question of -- they
        switch from -- they can be variable from day-to- day.

A.    But you didn't ask Ms. Xiang what those stressors were,
        correct?

        MR. ALTARAS:        Objection.

A.    She describes -- in her discussions, she brings up the
        stressors.

        MR. MARKEL: I'm sorry. Can you read back her answer?

        (Whereupon, the record was read back by the reporter.)

Q.    What stressors did she describe to you that she was suffering as
        of December 19, 2018?

A.    We didn't discuss specifically related to December 19, 2018.

Q.    Well, wouldn't it have been important to know what those
        independent stressors were?

        MR. ALTARAS:        Objection.

A.    That's -- people have different stressors. This is 2018. People
        have multiple stressors."

    ------------------------------------------------------------------------------

"Q.    And it wasn't important to you to know what stressors Ms.
        Xiang had experienced from July 24th, 2018 until June 5th,

2020 when you interviewed her?

MR. ALTARAS:        Objection.

A.    She could have lots of different things happening. She could have a broken leg. That would not be relevant.

Q.    Wouldn't it have been important to determine what independent stressors she's experienced from July 2018 until June 5th, 2020?

MR. ALTARAS:        Objection.

A.    She could have had independent stressors. I can't comment on those independent stressors.

Q.    Well, how would you be able to evaluate those independent stressors unless you asked about them?

A.    I couldn't comment on those independent stressors.

Q.    So you wouldn't be able to evaluate whether or not Ms. Xiang suffered from any independent stressors because you didn't ask about them, correct?

MR. ALTARAS:        Objection.

A.    I did not ask specifically about other stressors.

Q.    And that would be relevant to whether or not Ms. Xiang was experiencing anxiety, correct?

MR. ALTARAS:        Objection.

A.     I focused my description on her anxiety and what she was anxious about.

Q.    But your affidavit refers to the psychotherapy notes. As you said, it incorporates these psychotherapy notes, correct?

A.    Yes.

Q.    Wouldn't it have been important to ask Ms. Xiang about the

various stressors that are referenced in these psychotherapy

notes?

MR. ALTARAS:        Objection.

A.        I did not have a psychotherapy note open during the

interview."

Similarly, Dr. Frankel did not investigate data suggestively significant to

determination of whether Ms. Xiang: 1) suffered from prior mental health

difficulties, including particularly a history of problematic self-confidence or

self-esteem, or 2) possessed a personality-based predilection to be

depressively self-critical. Dr. Frankel testified:

"Q.    Do you see the next question is 'Past Failure'? Do you see she

circled '(2) As I look back, I see a lot of failures'?

A.    Yes.

Q.    Did you ask her what those failures were?

A.    No.

Q.    Did you think it was important to understand what failures Ms.

Xiang had suffered in the past?

A.    No."

The above referenced item constitutes Ms. Xiang's response to a

question on the BDI-II.

## FORENSIC PSYCHIATRIC CONCLUSION:

The evaluator's review of additional data since he prepared his earlier report
of February 4, 2021, strongly confirms that the methodology which Dr.
Frankel utilized to assess Ms. Xiang's mental state did not permit her to
reliably determine the nature, magnitude, duration, or causation of Ms.
Xiang's reported distress, including the impact of the alleged discrimination
upon her son's future development.

**Stuart B. Kleinman, M.D.**

**1623 3ʳᵈ Avenue**
**Suite 203**
**New York, New York 10128**
**(917) 680 2393**

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| **1990 - Present** | **Columbia University College of Physicians and Surgeons** |

| | |
|---|---|
| **2003 - Present** | **Associate Clinical Professor of Psychiatry** |
| **1990 - 2003** | **Assistant Clinical Professor of Psychiatry** |
| **1988 - 1990** | **Instructor in Clinical Psychiatry** |

| | |
|---|---|
| **1989 - Present** | **New York University School of Medicine** |

| | |
|---|---|
| **1989- Present** | **Instructor in Psychiatry** |
| **1988 - 1990** | **Instructor in Clinical Psychiatry** |

| | |
|---|---|
| **2013 -** | **Brooklyn Law School - Adjunct Professor of Law** |

## WORK EXPERIENCE

| | |
|---|---|
| **1988 - 1999** | **Forensic Psychiatry Clinic for the Criminal and Supreme Courts of Manhattan /Bellevue Hospital Forensic Psychiatry Clinic** |
| **1993 - 1994 (Approximate)** | **Consultant, Queens District Attorney's Office, Special Victims Bureau** |
| **1989 -** | **Independent (Case) Consultant, Crime Victims Compensation Board of New York State** |
| **1988 - 1996** | **Medical Director, Crime Victims Center, Brooklyn, New York** |

Stuart B. Kleinman, M.D.
December 2020

## TEACHING EXPERIENCE

**1988 - Present**     **Columbia University College of Physicians of Surgeons**

**1999 - Present**     **Columbia/Cornell Fellowship in Forensic Psychiatry**

**2011 - Present**     **Seminar-Assessment of Emotional Distress Claims in Civil Litigation**

**2007 - Present**     **Co - Director, Civil   Didactic Module**
**Subjects taught have included:**
  **(1) Assessment of Employment Discrimination/Harassment Emotional Distress Claims**
  **(2) Traumatic Stress**
  **(3) Memory/Dissociative Conditions**

**2012 - 2016**     **Faculty Co-Director, Columbia University Medical Center, Human Rights Asylum Clinic**

**1988 - 2018**     **Medical Student Teaching Methodology of Psychiatric Evaluation, Evaluation Clinic, New York Presbyterian Hospital**

**1989 - 1992**     **Course Director, Medical Student Elective in Psychiatry and Victimology**

**2013 - 2014**     **Brooklyn Law School- Seminar, Criminal Law and Psychiatry, Co-teacher**

**2005 -**     **Mount Sinai School of Medicine – Guest Lecturer, Assessment of Psychiatric Disability**

**1988 - Present**     **Forensic Psychiatry Didactic Lecture Series Sponsored by New York City Regional Forensic Psychiatry Training Programs, Lecturer:**

Stuart B. Kleinman, M.D.
December 2020

(1) Employment Discrimination
(2) 'White Collar Crime'/Sentencing Considerations
(3) Forensic Psychiatric Testimony

1992 - 1994    Instructor, Certified Trauma Curriculum, International Association
Of Trauma Counselors, Jersey City College

## SPECIALTY BOARDS

1994    Added Qualifications in Forensic Psychiatry,
American Board of Psychiatry and Neurology

2004   Recertification
2014   Recertification

1993    Certified Trauma Counselor,
International Association of Trauma Counselors

1989    Diplomate in Psychiatry,
American Board of Psychiatry and Neurology

## LICENSURE

2000    Connecticut

1987    New York

Stuart B. Kleinman, M.D.
December 2020

## HONORS AND AWARDS

| | |
|---|---|
| **2020** | **Distinguished Fellow, American Psychiatric Association** |
| **2011** | **Nancy C.A. Roeske, M.D. Certificate of Recognition for Excellence in Medical Student Education, American Psychiatric Association (Teaching done at Columbia University College of Physicians and Surgeons)** |
| **1990** | **Alumnus of the Year Award, The University of Pennsylvania School of Medicine, Center for Social-Legal Studies for work with victims of piracy and terrorism** |
| **1982** | **Alpha Omega Alpha** |
| **1980** | **Phi Beta Kappa** |

## PROFESSIONAL ORGANIZATIONS

**1988 - Present**    **International Society for Traumatic Stress Studies**

> **New York Chapter**
> > **1993 - 1995 President**
> > **1992 - 1993 Treasurer**

**1986 - Present**    **American Academy of Psychiatry and the Law**

> **2010 - 2013**    **Councilor**
> **1988 - 2013**    **Chairperson, Committee on Trauma and Stress (Formerly Victimology)**
> **1992 - 1993**    **Chair, Learning Resources Committee**
>
> **Tri-State Chapter**
> > **1996 - 1998  President**
> > **1994 - 1996  Vice President**
> > **1992 - 1994  Secretary**
> > **1991 - 1992  Councilor**
> > **1992          Program Chair, Annual Meeting, "Trauma, Children and the Law"**

4

Stuart B. Kleinman, M.D.
December 2020

|  | 1991 | **Program Chair, Annual Meeting, "Stress Response Syndromes and the Law"** |
|---|---|---|

**1984 - Present     American Psychiatric Association**

|  | 1994 | **DSM IV (Diagnostic Textbook of American Psychiatric   Association) Task Force Adviser regarding:** |
|---|---|---|

                               **1. Anxiety Disorders**
                               **2. Forensic Issues**

**New York County District Branch**

| | **2016- Present** | **Co-Chairperson, Forensic Committee** |
|---|---|---|
| | **2013-2016** | **Councilor** |
| | **2014-2016** | **Co-Chairperson, Committee On Legislative Affairs** |
| | **2001-** | **Task Force on Disasters** |

**2003 - 2012     Association of Threat Assessment Professionals**

                            **Northeast Chapter**
                            **2003 - 2005     Treasurer**

**1999 - 2001     Association of the Bar of the City of New York, Science and Law Committee - Adjunct member**

**1989     Ad Hoc Task Force on Interpersonal Victimization Disorders**

**<u>ACADEMIC PRESENTATIONS (APPROXIMATELY PAST TWENTY YEARS)</u>**

**April, 2020     "Ethical Issues and Professional Responsibilities: Addressing the Risk of Workplace Violence", Employment Discrimination Law & Litigation, Panel Presentation, Practicing Law Institute, New York, New York**

Stuart B. Kleinman, M.D.
December 2020

| | |
|---|---|
| **December, 2019** | **"Mental Illness and Anti-Social Behavior", Chengdu Chengyuantang Hospital, Chengdu University of T.C.M., China** |
| **October, 2019** | **"Prosecuting Former Child Soldiers: Complex Considerations at the ICC", Panel Presentation, 50th Annual Meeting, American Academy of Psychiatry and the Law, Baltimore, Maryland** |
| **June, 2019** | **"Damages in Employment Discrimination Cases", Employment Discrimination Law & Litigation, Panel Presentation, Practicing Law Institute, New York, New York** |
| **August, 2018** | **"White Collar Crime and U.S. Federal Sentencing Considerations", Forensic Psychiatry Training Programme, The Department of Psychiatry, University of Pretoria, South Africa** |
| **May, 2018** | **"Abduction, Indoctrination, and the Creation of Child Soldiers: Criminal Prosecution and Societal Reintegration?", Grand Rounds, Department of Pediatrics, Bronx Lebanon Hospital, New York, New York** |
| **April, 2018** | **"Ethical Issues and Professional Responsibilities: When Psychotherapists and Attorneys Work Together and Against Each other", Panel Presentation, Practicing Law Institute, New York, New York** |
| **March, 2018** | **"Using Psychiatric Experts Wisely", Evidence Issues and Expert Testimony in Employment Cases, Panel Presentation, New York University Employment Law Workshop for Federal Judges, New York, New York** |
| **February, 2018** | **"Changes in Policy and Practice in Asylum Law", Panel Presentation, Moderator, New York County Psychiatric Society, Forensic Committee, New York, New York** |
| **July, 2017** | **"Misremembering, Feigning, Alternate Universe? Evaluation and Treatment of Malingering in Forensic Settings", Ambien and Violence, Panel Presentation, International Academy of Law and Mental Health, Prague, Czech Republic** |
| **March, 2016** | **"Working with the Mental Health Professional", Psychological Issues in Employment Law Panel Presentation, Practicing Law Institute, New York, New York** |

| September, 2016 | International Criminal Court, Training Program in Traumatic Stress, and Implications for Violent Behavior, Hague, Netherlands |
|---|---|
| November, 2015 | "Mental Stability in the Workplace: Assessments, Accommodations and Responses to Threats and Violence", Panel Presentation, Practicing Law Institute, New York, New York |
| May, 2014 | "Homicide and Zolpidem: What Do We Know and How Do We Know It?" Panel Presentation, Annual Meeting, American Psychiatric Association, New York, New York |
| November, 2013 | "Understanding and Correctly Diagnosing DSM-V Trauma-Related Disorders," Grand Rounds, Trinitas Regional Medical Center, Elizabeth, New Jersey |
| October, 2013 | "PTSD in DSMV: More Defenses, More Awards?" Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, San Diego, California |
| October, 2013 | "Get a Doctor's Note: Legal Framework Under Which Employers May Obtain Health Care Information From NY Employees," Panel Presentation, New York State Bar Association Labor and Employment Section, Fall Meeting, Niagara-on-the-Lake, Ontario |
| October, 2012 | "Vets Come Home," Leader, Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, Montreal, Quebec |
| October, 2012 | "PTSD and TBI: Psychobiosocial Mechanisms of Resilience," Workshop, Annual Meeting, American Academy of Psychiatry and the Law, Montreal, Quebec |
| April, 2012 | "Stalking of a Psychiatrist: Ethical, Legal, and Forensic Issues," Grand Rounds, Mt. Sinai School of Medicine, New York, New York |
| March, 2012 | "White Collar Crime and Forensic Psychiatric Assessment," Northeast Chapter, Association of Threat Assessment Professionals, New York, New York |
| October, 2011 | "Neurolaw: Approaching Uses of Neuroimaging Evidence of PTSD," Leader, Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, Boston, Massachusetts |

Stuart B. Kleinman, M.D.
December 2020

| | |
|---|---|
| **March, 2011** | **"Making Your Case: The Effective Use of Expert Witnesses in Employment Litigation", Panel Presentation, New York City Bar Association, City Bar Center for CLE, New York, New York** |
| **October, 2010** | **"Mass Violence: Mass Liabilities," Leader, Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, Tucson, Arizona** |
| **March, 2010** | **"Insanity, Society and Morality," Brooklyn Law School, Brooklyn, New York** |
| **October, 2009** | **"Evidence-Based Prognosticating of PTSD," Leader, Panel Presentation, American Academy of Psychiatry and the Law, Baltimore, Maryland** |
| **October, 2008** | **"Risks of Forensic Use of Trauma-Specific Tests," Leader, Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, Seattle, Washington** |
| **March, 2008** | **"Posttraumatic Stress Disorder in Criminal Court," Grand Rounds, Mid-Hudson Psychiatric Center, Mid-Hudson, New York** |
| **October, 2007** | **"PTSD as Trier of Fact: Diagnosis and Daubert," Leader, Panel Presentation, American Academy of Psychiatry and the Law, Miami, Florida** |
| **April, 2006** | **"Problems with Posttraumatic Stress Disorder: Diagnostic and Forensic Utility," Annual Meeting, Tri-State Chapter of the American Academy of Psychiatry and the Law, New York, New York** |
| **October, 2005** | **"What is and Should Be the PTSD Stressor Criterion?  Scientific Understanding – Legal Implications," Leader, Panel Presentation, American Academy of Psychiatry and the Law, Montreal, Quebec** |
| **January, 2005** | **"Psychology of Perpetrators and Victims of Terrorism," Meeting of the Federal Bar Association, New York, New York** |
| **October, 2003** | **"The Use and Misuse of Psychological Tests," Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, San Antonio, Texas** |

| | |
|---|---|
| **May, 2003** | **"A Terrorist's Competency to Stand Trial: Assessing Amnesia," Leader, Panel Presentation, Annual Meeting, American Psychiatric Association, San Francisco, California** |
| **November, 2002** | **"The Insanity and Related Defenses," Conference, New York State Association of Criminal Defense Lawyers, Brooklyn, New York** |
| **January, 2002** | **"Forensic Psychiatric Assessment of Claims of Harassment and Disability Discrimination," Leader, Panel Presentation, Annual Meeting, Tri-State Chapter, American Academy of Psychiatry and the Law, New York, New York** |
| **January, 2002** | **"How Can They Do It: Dynamics of Those Who Commit Terrorism," Society for Liaison Psychiatry, Meeting, Beth Israel Hospital, New York, New York** |
| **November, 2001** | **"Psychological First-Aid for Terror Victims," Coalition of Voluntary Mental Health Agencies, Meeting, New York, New York** |
| **October, 2001** | **"Treatment of Traumatic Stress Disorders: Acute Interventions in Response to the World Trade Center Attack," Meeting, Columbia University Mental Health Training Project, New York State Psychiatric Institute, New York, New York** |
| **October, 2001** | **"Fibromyalgia Controversies: Diagnostic Dilemmas and the Americans with Disabilities Act," Leader, Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, Boston, Massachusetts** |
| **September, 2001** | **"Terrorism and Its Aftermath," Grand Rounds (with Randall Marshall, M.D.) Columbia University College of Physicians and Surgeons, New York, New York** |
| **April, 2001** | **"Understanding Psychiatric Disabilities Law: The Challenges of the ADA," Symposium, The Association of the Bar of the City of New York, New York, New York** |
| **March, 2001** | **"Sexual Harassment," NYU-Bellevue, Tri-State Chapter, American Academy of Psychiatry and the Law, Review Course, New York, New York** |

**October, 2000**    **"PTSD: Research, Evaluation and the Law," Leader, Panel Presentation, Annual Meeting, American Academy of Psychiatry and the Law, Vancouver, Canada**

## PUBLICATIONS

**Peer Reviewed Journals**

**Kleinman, S., Martell, D., "Failings of Trauma-Specific and Related Psychological Tests in Detecting PTSD in Forensic Settings, Journal of Forensic Sciences, Online, November 2014 10.1111/1556-4029.12606: 6-11**

**Levin, A., Kleinman, S., and Adler, J., "DSM-5 and Posttraumatic Stress Disorder," Journal of the American Academy Psychiatry and the Law, June 2014 42:2:146-158**

**Appel, J. M., Kleinman, S., "Stalked by a 'Patient," *Current Psychology,* 11 (10): 2012; 40-44**

**Paradis, C., Siegel, L., Kleinman, S., "Two Cases of Zolpidem-Associated Homicide," *The Primary Care Companion,* 14 (4): 2012; doi: 10.4088/PCC.12br 01363**

**Kleinman, S., "Managing the Managers: Supporting Functioning of Employees Facing Threats of Terrorism," *Psychiatric Services, Frontline Report*, 53 (10):2002; 1340-1341**

**Kleinman, S., "Terror at Sea: Vietnamese Victims of Piracy," *American Journal of Psychoanalysis,* 50(4):1990; 351-362**

**Kleinman, S., "Liberty and Tardive Dyskinesia: Informed Consent to Antipsychotic Medication in the Forensic Psychiatric Hospital," *Journal of Forensic Sciences, 35*(5): 1990; 1155-1162**

**Kleinman, S., "A Terrorist Hijacking: Victims' Experiences Initially and Nine Years Later," *Journal of Traumatic Stress Studies*; 2(1):1989; 49-58**

**Journal/Book Chapter**

**Kleinman, S., Stewart, L., "Psychiatric - Legal Considerations In Providing Mental Health To Disaster Survivors," *Psychiatric Clinics of North America*; Elsevier Saunders; 27 (2004); 559-570**

**Kleinman, S., "Managing Difficult Employees: Help in Avoiding Onerous Litigation and Workplace Violence, HR Advisor, 22(1): 2016**

**Book Chapters**

Kleinman, S., Egan, S., "Trauma Induced Psychiatric Disorders and Civil Law," Second Edition, in *Principles and Practice of Forensic Psychiatry*, R. Rosner, ed., New York: Chapman and Hall, 2003

Kleinman, S., 1998, "Psychopharmacological Management of Traumatic Stress and Aggression," in *Violence in Our Lives: Impact on Workplace, Home and Community*, E. Carll, Massachusetts: Allyn and Bacon

Kleinman, S., 1994, "Trauma Induced Psychiatric Disorders and Civil Law," in *Principles and Practice of Forensic Psychiatry*, R. Rosner, ed., New York: Chapman and Hall

Kleinman, S., 1994, "Trauma Induced Psychiatric Disorders in Criminal Court," in *Principles and Practice of Forensic Psychiatry*, R. Rosner, ed., New York: Chapman and Hall

**Professional Newsletter Articles**

Kleinman, S., "The Implicit Association Test and Employment Discrimination Litigation," *American Academy of Psychiatry and the Law Newsletter;* September 2018; 21.

Kleinman, S., "Trajectories of Post-Traumatic Response and Implications for Assessment of Damages," *American Academy of Psychiatry and the Law Newsletter;* September 2017; 19.

Kleinman, S., "Workplace Violence Among Returning Vets with PTSD," *American Academy of Psychiatry and the Law Newsletter;* January 2017; 23.

Kleinman, S., "Prognosticating Emotional Distress: What September 11, 2001 and Other Traumas Reveal," *American Academy of Psychiatry and the Law Newsletter;* September 2012; 16.

Kleinman, S., "A Forensic Psychiatric View of the Currently Proposed DSM-5 PTSD Stressor Criterion," *American Academy of Psychiatry and the Law Newsletter;* September 2011; 16.

Kleinman, S., "Introducing Neuroimaging Data Regarding PTSD to Triers of Fact," *American Academy of Psychiatry and the Law Newsletter;* January 2011; 21.

Stuart B. Kleinman, M.D.
December 2020

Kleinman, S., "Understanding Resilience in Trauma Exposed Individuals," *American Academy of Psychiatry and the Law Newsletter;* September 2009; 21.

Kleinman, S., Reisman, J.A., "Non-A1 Stressors May Produce PTSD," *American Academy of Psychiatry and the Law Newsletter;* September 2008; 11.

Butler, J., Kleinman, S., "The PTSD Stressor Criterion: An International View," *American Academy of Psychiatry and the Law Newsletter;* January 2007; 26.

Kleinman, S., "How International Courts View PTSD Stressor Criteria," *American Academy of Psychiatry and the Law Newsletter;* August 2006.

Kleinman, S. "PTSD: The Stressor Criterion," *Academy of Psychiatry and the Law Newsletter;* September 2005.

Kleinman, S., Egan, S. B., "ADA and Trauma Related Conditions," *Academy of Psychiatry and the Law Newsletter;* September 2001.

Kleinman, S., "Hostile Work Environment," *Academy of Psychiatry and the Law Newsletter;* September 2000.


**Book Reviews**

Kleinman, S., 1994, Review of "Trauma and Recovery: The Aftermath of Violence From Domestic Violence to Political Terror," J. Herman, New York: Basic Books in *Bulletin of American Academy of Psychiatry and the Law*


**Resident/Psychiatrist-In-Training Journal**

Kleinman, S., "Trauma and its Ramifications in Vietnamese Victims of Piracy," *The Jefferson Journal of Psychiatry*, 5(2):1987, Article 4


**Journal Reviewer**

2013 - 2019   Reviewer, *Journal of the American Academy of Psychiatry and the Law*


**<u>TRAINING</u>**

**Fellowship/Specialty Training**

Stuart B. Kleinman, M.D.
December 2020

**1987 - 1988**       **New York University Medical Center- Bellevue Hospital,**
                 **Forensic Psychiatry**

**1986 - 1987**       **The University of Pennsylvania School of Medicine, Center for**
                 **Social-Legal Studies, Psychiatry and Law**

**Residency**

**1984 - 1987**       **The Institute of Pennsylvania Hospital**

**Internship**

**1983 - 1984**       **Pennsylvania Hospital**

**<u>EDUCATION</u>**

**1979 - 1983**       **Medical College of Pennsylvania**

**1977 - 1979**       **B.A., Lehigh University**
                 **(B.A. - M.D. accelerated joint program)**

**Stuart B. Kleinman, M.D.**
**1623 3rd Avenue**
**New York, New York 10128**
**~**
**917-680-2393**

TESTIMONY PAST FOUR YEARS
2021

COURT

Criminal Cases

U.S. v. R. Kochonies                       U.S. District Court, Eastern Div.

State v. Ferrufino                         State Supreme Court, Nassau County

Civil Cases

Murray v. UBS                             U.S. District Court, Southern Div.

Velasquez v. ATCO Properties              State Supreme Court, New York County

DEPOSITION

Saraf v. West Publishing                  U.S. District Court, Southern Div.

Oyo v. ANZ                                U.S. District Court, Southern Div.

Schweihs v. JPMorgan Chase                Circuit Court, Cook County, Illinois

Hernandez v. Office of the Commissioner of Baseball, et al U.S. District Court, Southern Div.

*Kleinman, M.D., Stuart, February 2021*

**STUART B. KLEINMAN, M.D.**
**1623 3RD AVENUE**
**SUITE 203**
**NEW YORK, NY 10128**
**TELEPHONE (917) 441-7500**

**<u>FEE SCHEDULE</u>**
**<u>2021</u>**

1)    Out of Court Work, including:

    a)    Record review
    b)    Forensic Psychiatric evaluation
    c)    Report preparation
    d)    Consultation(s) with attorney
    e)    Preparation for courtroom testimony
    f)    Local travel

    FEE:    $ 830.00 per hour

2)    Courtroom/Deposition Testimony:

    FEE:    $6,400.00 per full day
         (A 'full day' is defined as eight hours; time used for travel is additionally
         charged unless total time utilized, including for travel, is 8 or less hours)

         The retaining party guarantees payment of Dr. Kleinman for any scheduled
         deposition appearances.

         Payment by plaintiff for any deposition appearance is to be made in full
         seven days before any scheduled deposition appearance.

         If Dr. Kleinman is deposed and not paid by plaintiff, the retaining party will pay
         his deposition appearance fee within seven days of any scheduled deposition
         appearance.

3)    Retainer Required:  $12,500

4)    Retainer Policy:

    A retainer is to be paid before work is begun, and replenished as needed. Any unused
    portion of a retainer is returned upon completion of assignment.

5)    Cancellation Policy:

    Cancellation of reserved courtroom/deposition testimony and of scheduled forensic
    psychiatric evaluation is charged as follows:
    a)    Four or more full work days in advance    - no charge
    b)    Three full work days in advance      - 50% of fee for reserved
                                            time charged

2

    c)      Two or less full work days in advance        - 100% of fee for
                                                                           reserved time charged

All fees are to be paid regardless of opinion proffered.