UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/15/2022__
```

-----------------------------------------------------------------X
                                          :
VIVIAN XIANG,                             :
                                          :
                    Plaintiff,            :
                                          :                    19-cv-1752 (LJL)
                                          :
        -v-                               :
                                          :                    OPINION AND ORDER
                                          :
EAGLE ENTERPRISES, LLC, MARKET AMERICA,   :
INC., AMY REMACHE, and SHERRY SPESOCK,    :
                                          :
                    Defendants.           :
                                          :
-----------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

    Defendants Eagle Enterprises, LLC ("Eagle Enterprises"), Market America, Inc.

("Market America" and together with Eagle Enterprises, the "Company"), Amy Remache

("Remache"), and Sherry Spesock ("Spesock" and collectively, "Defendants") move for

summary judgment on the claims against them, Dkt. No. 45, and to preclude plaintiff Vivian

Xiang's ("Plaintiff") proffered expert witness, Gladys Frankel, Ph.D. ("Dr. Frankel") from

offering an opinion into evidence.  Dkt. No. 42.

    For the following reasons, the motion for summary judgment is granted.  The motion to

preclude is denied as moot.

## BACKGROUND

### I.    Procedural History

    Plaintiff  was a graphic designer employed by her former employer, Eagle Enterprises,

for approximately five years until she was terminated.  Dkt. No. 55 ¶¶ 4–5; Dkt. No. 47 ¶ 30;

Dkt. No. 57 ¶ 54.  Eagle Enterprises, which is now defunct, was a staffing company that

provided services to Market America.[1]  Dkt. No. 55 ¶ 3.  Following her termination, Plaintiff

sued Eagle Enterprises, Market America, and individuals employed by Market America—

Remache, Spesock, and an individual that has since been dismissed from this action, Star Hogan

("Hogan")—alleging that she was fired because she was pregnant and had stated an intention to

take maternity leave.  Plaintiff brings claims under for discrimination and retaliation under Title

VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act of 1990

("ADA"), the New York State Human Rights Law ("NYSHRL"), and the New York City

Human Rights Law ("NYCHRL") as amended by the Pregnant Workers Fairness Act

("PWFA").

Defendants moved to dismiss the action pursuant to Federal Rule of Civil Procedure

12(b)(6).  Dkt. No. 6.  By Opinion and Order dated January 16, 2020, Judge Engelmayer, to

whom the case was then assigned, denied the motion to dismiss in part and granted it in part;

specifically, he dismissed Plaintiff's: (1) NYSHRL and NYCHRL discrimination claims as

against Hogan; (2) PFWA claim as against the individual defendants; (3) ADA discrimination

claims; (4) Title VII, NYSHRL, and ADA retaliation claims; (5) claims for aiding and abetting

under the NYSHRL and the NYCHRL; and (6) claim for discrimination under the PWFA.  *See*

Dkt. No. 16.  Thereafter, Defendants answered the complaint, and the case was reassigned to the

undersigned.  Following the close of discovery,[2] Defendants moved both to preclude Plaintiff's

---

[1] Both Spesock and Plaintiff stated that Market America owned Eagle Enterprises, *see* Dkt. No.
48-7 at 31–32; Dkt. No. 57 ¶ 4; Dkt. No. 48-6 at 139, while MacCaull testified that there is a
"connection between Market America and Eagle Enterprises," Dkt. No. 48-8.

[2] By letter motion dated March 25, 2021, counsel for Defendants sought resolution of certain
discovery disputes but noted that the letter motion was submitted before the close of discovery
"solely to preserve Defendants' rights to secure completed and fully executed authorizations to
obtain medical records . . . to the extent and only to the extent that any of Plaintiff's claims
survive Defendants' motion for summary judgment."  Dkt. No. 41 at 1.  In accordance with
Defendants' request that its motion "be held in abeyance and considered in the event that any of

proffered expert witness, Dr. Frankel, and for summary judgment. Dkt. Nos. 42, 45. Defendants

seek summary judgment on each of Plaintiff's remaining claims for: (1) discrimination and

failure to accommodate under Title VII and the NYSHRL; (2) discrimination against Spesock

and Remache under the NYSHRL and NYCHRL; (3) discrimination claims against Eagle

Enterprises and Market America under the NYCHRL; (4) failure to provide a reasonable

accommodation under the PFWA; (5) retaliation claims under the NYCHRL; and (6) employer

liability claim under the NYCHRL. *See* Dkt. No. 46.

## II.     Factual Background

The following facts, construed in favor of the non-moving party, are undisputed for

purposes of summary judgment except where otherwise noted.[3]

---

Plaintiff's claims survive Defendants' forthcoming motion for summary judgment," *id.* at 3, the
Court has so far deferred ruling on this motion. It is now denied as moot.

[3] Under Federal Rule of Civil Procedure 56:

> [a] party asserting that a fact . . . is genuinely disputed must support the assertion
> by: (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations,
> stipulations (including those made for purposes of the motion only), admissions,
> interrogatory answers or other materials; or (B) showing that the materials cited do
> not establish the absence or presence of a genuine dispute, or that an adverse party
> cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). Moreover, Local Civil Rule 56.1 states that "[e]ach numbered
paragraph in the [moving party's] statement of material facts . . . will be deemed to be admitted
for the purposes of the motion unless specifically controverted by a correspondingly numbered
paragraph in the statement required to be served by the opposing party," Local Civ. R. 56.1(c),
and that "each statement controverting any statement of material fact[] must be followed by
citation to evidence which would be admissible," *id.* at (d). At various points in her response to
Defendants' statement of undisputed facts, Plaintiff states that she "lacks knowledge or
information sufficient to either admit or deny the factual allegation asserted by the Defendants."
*See, e.g.*, Dkt. No 55 ¶¶ 1–3, 6, 30, 33, 42, 55, 56. To the extent that the relevant statement of
the Defendants is supported by record evidence, Plaintiff's assertion that she "lacks knowledge
or information sufficient to either admit or deny" the facts contained in the statement is
insufficient to render those facts genuinely disputed. The Court will consider such statements to
be undisputed. *See Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 12–13 (2d
Cir. 2018) (summary order) (holding that the district court did not abuse its discretion in
"crediting as undisputed those facts that [plaintiff] did not properly controvert in her opposition"
where "defendants properly cited to the record to support their facts," the district court conducted

A.      **Plaintiff's Employment**

In July of 2013, Plaintiff became employed as a graphic designer by Social Streaming & Shopping Development, LLC, which later changed its name to Eagle Enterprises, LLC.  Dkt. No. 55 ¶¶ 4–5.  In this role, she provided graphic design services to Market America.  *Id.* ¶ 4; *see also* Dkt. No. 48-6 at 143.  On March 30, 2016 and April 13, 2017, Plaintiff signed at-will employment agreements with Eagle Enterprises.  Dkt. No. 55 ¶ 5.  These agreements were supplemented by an employee handbook (the "Employee Handbook"), and the agreements stated that "the Eagle Employee Handbook is to be used as a supplement to this Agreement.  Many policies of Eagle that are not included in this Employment Agreement are included in the Employee Handbook."  *Id.*  The Employee Handbook was emailed to Plaintiff in January 2016.  Dkt. No. 48-6 at 170.

Market America is headquartered in North Carolina.  Dkt. No. 55 ¶ 2; *see also* Dkt. No. 48-6 at 145.  It employs over 700 people globally.  Dkt. No. 55 ¶ 2.  Remache is Market America's Director of Creative Services.  *Id.* ¶ 7.  She supervised Plaintiff from October 2017 until Plaintiff's termination in July 2018.  *Id.*  Kristin MacCaull ("MacCaull"), who reported to Remache, managed the design department as the Creative Services Art Director.  *Id.* ¶ 9.  Spesock was Market America's Director of Human Resources ("HR") at all times material to the instant action.  *Id.* ¶ 8.  Spesock has three children.  *Id.*

The Employee Handbook states that the office hours are generally 8:30 a.m. to 5:00 p.m. Monday through Friday.  *Id.* ¶ 68.  Plaintiff testified that her hours were "always nine to five," Dkt. No. 48-6 at 160–61, that she did not take a lunch break, *id.* at 168, and that from the day she was hired, she was told by the previous office manager that she could start work from 9:00 a.m.,

_____

some scrutiny into the record, and the plaintiff responded to defendants' Rule 56.1 statement "by stating, for example, she 'lacks sufficient knowledge or information to admit or deny'").

*id.* at 182.  She testified that she had a conversation in 2018 with Spesock where Spesock agreed that Plaintiff could keep working from 9:00 a.m. to 5:00 p.m., *id.* at 183–87, and there is an email from Spesock to Remache and the President of Market America where Spesock stated "[w]e did agree to allow Vivian to work from 9–5 due to her not leaving the office for lunch and eating at her desk," Dkt. No. 58, Ex. B.  Plaintiff also testified that in 2016, when she was being supervised by Agnes Cruz ("Cruz"), she was permitted to work from home so long as she let Cruz know in advance, except that no was allowed to take time off or work from home during company conventions in July to August and January to February.  Dkt. No. 48-6 at 162–64.

In October of 2017, Spesock emailed Plaintiff to ask her to fill out an attendance log each day.  Dkt. No. 48-6 at 270; Dkt. No. 49-8.  According to Spesock, this was in order to resolve difficulties tracking New York-based employees' time and attendance.  Dkt. No. 49 ¶ 46.  On February 6, 2018, Spesock wrote to Plaintiff and requested her to use her badge at the door to clock out when she left for the day, which allowed the Company to keep track of her time.  Dkt. No. 48-6 at 273; Dkt. No. 58 at ECF p. 83.

On March 28, 2018, MacCaull completed an annual review form for Plaintiff.  Dkt. No. 55 ¶ 22.  Plaintiff received a rating of "Meets Expectations" for every metric except for "Attendance," where she received a rating of "Need Improvement"; in the "Attendance" section, MacCaull wrote "Vivian should work on arriving to the office on time and staying until the day is over."  *Id.* ¶ 22; *see also* Dkt. No. 58 at 54–58.  The next day, Plaintiff received an email from Remache stating that Plaintiff's "merit increase of 1% has been approved."  Dkt. No. 58 at 85; Dkt. No. 55 ¶ 20.  At her deposition, Plaintiff testified that her one-percent raise "means it should be okay, my performance is okay" and that a raise "means you're doing good with your job."

Dkt. No. 48-6 at 315–16.  Spesock agreed at her deposition that a pay adjustment "would occur if the employee was performing well to warrant a merit increase."  Dkt. No. 48-7 at 45.

In January of 2016, Plaintiff had her first child and took twelve weeks of maternity leave. *Id.* ¶ 18.  In 2016, Cruz was Plaintiff's supervisor.  Dkt. No. 48-6 at 153; Dkt. No. 47 ¶ 76. When Plaintiff had her first child, she took and returned from twelve weeks of maternity leave "without any incident."  Dkt. No. 55 ¶ 18.  Plaintiff testified that, for her first maternity leave, a benefit manager named Maria sent Plaintiff a set of forms to fill out and return to Maria and that, other than returning the form and letting Maria know the actual day of birth, Plaintiff "didn't do anything."  Dkt. No. 48-6 at 190.

In or around April 2018, she informed Remache—who had been Plaintiff's supervisor since October 2017—that she was pregnant.  Dkt. No. 55 ¶ 16.  Remache communicated her congratulations, *id.* ¶ 17, and told Plaintiff that she "was happy for her, genuinely very happy for her," *id.* ¶ 16.  The parties agree that no one at the Company ever "told [Plaintiff] 'not to get pregnant' or said anything about her pregnancy in a derogatory matter [sic]."  *Id.* ¶ 49.

## B.     Allegedly Discriminatory Acts

### 1.     Plaintiff's Termination

On June 29, 2018, Remache wrote to Spesock to request a meeting to discuss releasing a few of Remache's designers on account of restructuring and poor work performances.  Dkt. No. 55 ¶¶ 24, 45; Dkt. No. 50-2 at 1; Dkt. No. 48-7 at 91–93 (Spesock testifying that the decision to terminate Plaintiff was made because of performance, the closing of the New York office, and because Remache was making organizational changes to the department).  In advance of their meeting, which was set for July 2, 2018, Remache emailed Spesock a memorandum explaining the decision (which was arrived at with MacCaull) to terminate five graphic designers.  Dkt. No. 55 ¶ 26.  In that memorandum, Remache listed five designers who she and MacCaull "would like

to release from their duties at Market America," noting that "[e]ach designer [listed] does not meet the requirement we need to have on the team." *Id.* ¶ 27; *see also* Dkt. No. 50-2 at 3. Remache detailed why she wanted to release each designer.  The list included Plaintiff.  With respect to Plaintiff, Remache stated:

> I would like to release Vivian Xiang because of the following:
>
> - We feel Vivian is one of the weaker designers as well
>
> - Because she is in NY, she is out of the loop.  We have made efforts to include her in the team, but she has been resistant to reach out.  She has mostly reached out to me to help answer questions for her without fully researching or finding them out herself.
>
> - We have a few off-site employees who know exactly how to stay in touch with the team and Vivian does the complete opposite.  We tend to forget she is even on the team because of her lack of communication with everyone.
>
> - We cannot give her a lot of jobs since she isn't very detail oriented.  Eileen Lynch also brought to my attention she has been making mistakes and changes when their team has approved the artwork on review.  Her team is now having to review each project more in-depth, when they shouldn't.

Dkt. No. 55 ¶ 28; *see also* Dkt. No. 50-2 at 4.  She continued:  "We feel that none of the 5 above make this Company a priority and are very eager to leave at 5:00 P.M." Dkt. No. 50-2 at 5. Eileen Lynch, referenced in Remache's memorandum, was the International Product Manager for the Company's beauty line.  Dkt. No. 55 ¶ 29.  Remache testified that Lynch requested that Plaintiff no longer be put on a particular project because it was "just too much work on [Lynch's] end to have to go back to every review for that particular project, because [Plaintiff] kept making careless mistakes, and the project was never going to get completed." *Id.*  The five designers—who comprised approximately half of the design team at the time—listed in Remache's memorandum were terminated over a three-week period in July of 2018.  *Id.* ¶ 30. One designer was released on July 3, 2018, three designers were released on or about July 18, 2018, and Plaintiff was terminated last, on July 24, 2018.  *Id.*  Of the four other designers that

were terminated in July 2018, one was a male, and none of the three females communicated that they were pregnant during the decision-making process. *Id.* ¶ 33. The other designers that were terminated had similar annual review ratings as Plaintiff, with the exception of one terminated designer who had only been with the Company for a short time and therefore did not have an annual review. *Id.* ¶ 22; *see also* Dkt. No. 51-2 (annual review form for terminated designer containing nearly all "Meets Expectations" ratings and one "Exceeds Expectations" rating for a higher total score than Plaintiff); Dkt. No. 51-3 (annual review for terminated designer containing nearly all "Meets Expectations" ratings and [one] "Need Improvement" rating); Dkt. No. 51-4 (same). At the time of Plaintiff's termination, she was the only member of her graphic design team located in New York City. *Id.* ¶ 6.

Spesock testified that the decision to terminate Plaintiff included discussions with Remache, the legal department, and the president of the Company. *Id.* ¶ 31. Spesock also testified that she told Plaintiff that the Company was terminating her because it was closing the New York office, Dkt. No. 48-7 at 89, but Plaintiff denies that she knew that the office was closing, Dkt. No. 48-6 at 315, or that the closing had anything to do with her termination, Dkt. No. 57 ¶ 54. Following the phone call to Plaintiff to convey her termination, Remache wrote Spesock a lengthy email recording that at the meeting to announce Plaintiff's termination, Plaintiff had made accusations that the termination was in respect to her pregnancy and to document the Company's reasons for terminating Plaintiff. Dkt. No. 55 ¶ 39; *see also* Dkt. No. 48-9 at 109–10 (Remache testifying to Plaintiff's statements made during the meeting regarding her pregnancy and the termination). That email started:

1. Job title changed to Senior Graphic Designer for no other reason but of favoritism by Agnes Cruz. Vivian is nowhere near meeting the criteria for that title based on her performance, experience and talent for the past few years I've known her.

2. Vivian at time has not followed proper protocol from Corporate.  Even if Agnes Cruz approved her to do so, in the back of your mind, you HAVE to realize that this isn't fair to the company or team.  Travel time/length is a personal situation and should never be an excuse to go against SOP or professional responsibility. An employee, in my opinion, should make changes to their schedule to ensure that they respect the Company's handbook.

Dkt. No. 50-3 at 1–2; Dkt. No. 58, Ex. G at 2.  The email then stated:

3. In a professional environment, an Employee should not use their pregnancy, a personal decision, interfere with her responsibilities at their job.  Since she was the one who brought up her pregnancy during today's meeting, it shows that her only priority and focus is that and not providing the best design, motivation or quality of work to the team.  Vivian made our meeting and releasing decision personal by that up.

Dkt. No. 50-3 at 1–2; Dkt. No. 58, Ex. G at 2.  After detailing concerns with Plaintiff in seven additional numbered paragraphs, the email concluded:

My decision to release Vivian Xiang is directed toward her performance, period. She is not qualified to be a Senior Designer at all.  She lacks common design sense and requires a lot of assistance therefore, I've made the decision, which Kristin [MacCaull] agrees with, to remove her from all rebranding, new branding and projects that require starting from scratch.  All of the projects she currently has and has had revolve around taking artwork that a designer from corporate has completed a US ENG version of.  She is not self-motivated or brings any motivation to the team.  We have a few offsite employees who are constantly communicating with their managers and fellow team. . . .  Vivian is the direct opposite.  She will communicate only to myself and Kristin when work is low but never reaches out to her fellow team to help them.  I've asked my entire CS team to 'check-in' with their managers before leaving for the day when the first official black out day started. Vivian still did not.  Even when we met with the designers after we released the four designers, we discussed again to the entire design team what needed to be done.  Still, nothing.

As the Director of CS, I do not want a designer on my team who just sits back and does whatever they want, or the bare minimum.   Vivian has absolutely no distractions up in NYC, so her work should be done to the best of her ability and turned around quicker.  Vivian lives in one of the most influential places in the U.S. and she is not motivated to look outside her office walls to see what we could do differently for beauty, health and nutrition, etc.  She isn't passionate about design and as I've mentioned before I need to have designers that live, breathe design.  A true designer doesn't turn it off at the end of the day.  We are influenced and motivated by things around us and inspire our own self but others around them to do something new.

9

Dkt. No. 58, Ex. G at 2.

MacCaull forwarded the email to Spesock, stating: "Good morning Sherry, The information below is a thorough and accurate description of Vivian's behavior and lack of contribution as a Market America employee. I completely agree with everything stated and will add that I fully support and was part of the decision to release Vivian from her duties at Market America." Dkt. No. 50-3 at 1.

Remache did not draft similar emails for the other four designers who were terminated around the same time as Plaintiff; Remache testified that she did not do so because "[t]here was no need. The reason for them being released was clear, and they understood, and that was it." Dkt. No. 48-9 at 167–68. She testified that she felt the need to draft the email with respect to Plaintiff "to go into even more detail because she was claiming the fact of discrimination against her because she was pregnant" and "to get all of, all of this out on, in an email to Sherry that it was not the case and the claim was just absurd." *Id.* at 165–66. The day Plaintiff was terminated, Spesock sent a proposed severance agreement to Plaintiff which contained a release of claims, but Plaintiff never signed it. Dkt. No. 55 ¶¶ 35–36.

### 2.   Plaintiff's Inquiries Regarding Maternity Leave

Spesock, who was the Director of HR during both of Plaintiff's pregnancies, was informed of Plaintiff's second pregnancy on Tuesday, June 12, 2018, when Plaintiff was five months pregnant. *Id.* ¶ 19. At 4:27 p.m. on that day, Plaintiff emailed Spesock:

> Hi Sherry,
> I want to inform you that I'm pregnant and the due day is end of October.
> I noticed that NY state has new Paid Family Leave policy start from January 1, 2018.
> Do you have any information regarding the benefits on my situation?
> From my last pregnancy, Maria helped me went through all the forms and benefits.
> Do we have a new person in charge of the benefit part now?
> Please advise and thanks for your help!

> Best,
> Vivian

Dkt. No. 49-6 at ECF p. 3.  Plaintiff followed up on the same e-mail chain at 10:35 a.m. on the

Friday, June 15, 2018, writing:

> Hi Sherry,
> I just want to check with you if there's any information you can pass over?
> Or is there a key person I can talk to?
> Appreciate for your help!
>
> Best,
> Vivian

*Id.*  One minute later, Spesock responded:  "So sorry Vivian!  I have attached our new Benefits

Manager, Star Hogan to this email and we will be in touch next week!"  *Id.* at ECF p. 2–3.  On

June 20, 2018—the Wednesday of the following week—Plaintiff followed up with Spesock and

Hogan, asking "Do you have any information regarding NYC new maternity policy yet?"  *Id.* at

ECF p. 2.  Hogan replied a few hours later, attaching a document about filing a leave request or

short-term disability claim and writing:

> Vivian –
>
> In preparation for your maternity leave, please review the attached FMLA request
> information.  Unum is the administrator of the FMLA benefit and they are
> knowledgeable regarding the new maternity leave policy for residents of New
> York.  When you contact them, they can provide you with policy language as well
> as address your specific questions.

*Id.* at ECF p. 2.  Around that time, Spesock advised Hogan to "reach out to legal to confirm the

new laws."  Dkt. No. 49 ¶ 25; *see also* Dkt. No. 48-7 at 68 (Spesock testifying that she and

Hogan were researching information related to the new New York laws and that she advised

Hogan to reach out to UNUM and legal).

   Plaintiff was assisted with her maternity leave requests by different people during her

first and second pregnancies.  In her first pregnancy, a "Maria" from HR assisted her with the

process, but during her second pregnancy, Maria no longer worked in HR.  Dkt. No. 55 ¶ 54.

Plaintiff testified that, at the time of her second pregnancy, there was a new law in place in New

York City regarding paid maternity leave.  Dkt. No. 48-6 at 204; Dkt. No. 48-7 at 67.  As

Hogan's email indicates, at the time Plaintiff sought advice regarding maternity leave for her

second pregnancy, the Company's HR department was no longer handling maternity leave

applications in-house, and employees were instructed to contact the administrator, UNUM,

directly.  Dkt. No. 55 ¶ 55; *see also* Dkt. No. 48-7 at 68–69 (Spesock testifying that Market

America began outsourcing their Family Medical Leave Act matters in September of 2016).

Plaintiff testified that she spoke with UNUM but had more questions and that UNUM then

directed Plaintiff to contact Hogan for Plaintiff's questions.  Dkt. No. 55 ¶ 60.  Plaintiff and

Hogan continued to correspond about Plaintiff's questions, with Hogan informing Plaintiff on

June 25, 2018 that Hogan was awaiting a response from her account manager regarding

Plaintiff's questions.  Dkt. No. 58, Ex. K.  On July 2, 2018, Plaintiff e-mailed Spesock, copying

Remache and MacCaull, asking:  "Could you give me a call back since I couldn't reach you on

Friday and I also have some important question regarding maternity leave.  Star could not answer

my question and was waiting for your help."  Dkt. No. 49-7 at ECF p. 3.  During both of

Plaintiff's pregnancies, Spesock was the Director of HR.  Dkt. No. 55 ¶ 56.

When asked at her deposition how she thinks Market America has discriminated against

her, Plaintiff stated that "they're not letting me, they're not going easy with my pregnant-related

doctor appointment and they are being very strict on my hours."  Dkt. No. 48-6 at 197.  She

continued that there were always difficulties contacting Spesock, that Spesock often did not reply

to Plaintiff when she attempted to contact her, and that Spesock did not help Plaintiff with her

maternity leave.  *Id.* at 198–200.  According to Plaintiff, she was treated differently from her first

pregnancy to her second pregnancy, and, for her second pregnancy, Spesock was "not helping [her] for all maternity leave problems . . . compared to what experience [she] had before with Maria," who assisted Plaintiff with her prior maternity leave. *Id.* at 203. Plaintiff testified that not getting help back fast enough from HR is "a discrimination" from her point of view, Dkt. No. 55 ¶ 51; Dkt. No. 48-6 at 295, and that she felt discriminated against by the "[l]ack of help with [her] maternity leave stuff," Dkt. No. 48-6 at 214. When asked if she felt better to know that she was one of many people terminated, Plaintiff explained that "it doesn't make me feel better because they disrespect me for my pregnancy." *Id.* at 256. She did not otherwise testify to believing that her termination was based on her pregnancy.

### 3. Plaintiff's Inquiries Regarding Paid Time Off ("PTO") and Work-from-Home

Plaintiff testified that she felt discriminated against by Remache treating Plaintiff differently than she did other members of the team. Dkt. No. 48-6 at 214. Plaintiff testified that she belied that she was discriminated against because, even though Remache knew she was pregnant and had a lot of doctor's appointments, Remache said that Plaintiff would not be able to work from home after a doctor's appointment on June 18th. *Id.* Plaintiff testified that employees are "allowed to work from home for these kind of absence" and were previously permitted to do so but that Remache was "being very strict on [Plaintiff] and saying time off is not allowed, and then [Remache] insist[ed] that [Plaintiff had] to submit a PTO for it." *Id.* She testified that, during a meeting the following day, "someone was requesting for work brought home and [Remache] granted on the meeting" and that "[i]t was different before and she's even allowed other people to . . . work from home, but not [Plaintiff]." *Id.* at 214–15. Plaintiff was unable at deposition to identify the name or gender of the team member who was allowed to work from home. *Id.* at 220–21. Remache disputed this at her deposition, testifying that she did not recall a

day that Plaintiff asked her to work from home to accommodate a doctor's appointment and that she did not make a decision at the meeting to permit any other employees to work from home. Dkt. No. 48-9 at 68, 70–71.  In an affidavit, Remache stated that "[t]o [her] knowledge, Plaintiff never requested an accommodation to attend a medical appointment or to work from home (other than for inclement weather reasons such as a snowstorm in New York)."  Dkt. No. 50 ¶ 45.

There is evidence that working from home was permitted in non-blackout time periods for times when employees were sick or injured but could still work a full day.  Dkt. No. 51-5 at ECF p. 4.  On June 19, 2018, MacCaull sent the team an email with attached information about taking time off, which stated:

**Time Off/WFH**
- if you are late or want to request a WFH day, it is your responsibility to communicate that to Amy and Kristin (not one or the other)
- outside of emergencies, there is no WFH or PTO during blackout time
- WFH will only be approved if you are sick/injured, etc. and can't come in, but can still work a full day
- WFH can't be used for any other reason other than the above mentioned; pto or unpaid time off will need to be used

*Id.*  Plaintiff did not testify that she requested to work from home under any of these circumstances.

It is undisputed, moreover, that aside from circumstances where an employee was sick or injured, working from home was not generally permitted and that, when it was permitted, supervisor pre-approval was necessary.  *See* Dkt. No. 49 ¶ 45 (Spesock stating in her affidavit that "[w]orking from home was not contemplated under existing Company policy at the time in question"); Dkt. No. 50 ¶ 42 (Remache stating in her affidavit that "working from home wasn't an established Company policy either").

There is evidence that when Plaintiff was supervised by Cruz, and before she was supervised by Remache, Plaintiff was permitted to work from home with the approval of her

manager.  *See* Dkt. No. 48-6 at 214, 218.  Aside from Plaintiff's testimony that an unidentified

employee was given permission on June 19th to work from home, there is no evidence that

Remache permitted any employee—including Plaintiff—to work from home.  Dkt. No. 48-9 at

72–73.  Thus, Remache testified that Plaintiff worked from home only when she was under

Cruz's leadership and that this working from home was not company policy.  Dkt. No. 48-9 at

88–89.  An email dated February 21, 2017 from an Associate Project Manager stated:

> Team,
>
> I know that an occasional day at home to work can be helpful.  Working from home
> is not part of our company policy and can be granted only with my prior approval.
> In the future make sure that a request to work from home to accommodate personal
> needs has to be sent to Agnes in a timely manner.  All employees working from
> home for any amount of time must gain Agnes' **pre**-approval.
>
> If such a work-at-home arrangement appears appropriate, a proposal that includes
> an explanation of the circumstances that make it beneficial must be presented and
> approved.
>
> **Pre**-approval requires an email with information requested above to Agnes with
> myself copied.

Dkt. No. 50-4.

Plaintiff also views a request that she take PTO for an absence of less than four hour as

discriminatory.  According to the Employee Handbook, employees are to "charge leave from

PTO for partial day absences of 4 hours or greater until their PTO is exhausted."  Dkt. No. 58,

Ex. A at 12.  Leave requests for less than four hours do not require PTO to be charged, but the

Employee Handbook also does not prohibit charging PTO for absences of less than four hours.

Dkt. No. 55 ¶ 69.  Spesock testified to this effect in her deposition, agreeing that "leave requests

for less than four hours do not require charging PTO," Dkt. No. 48-7 at 47, but also testifying

that she typically requires the employees she supervises "to work at least five hours, to where

they do not submit PTO," *id.* at 79; *see also* Dkt. No. 49 ¶¶ 43–44.  In her affidavit, Spesock

wrote that "[t]he Company's policies and practices follow the New York City Paid Safe and Sick Leave Law, which allows employers to debit four (4) hours of PTO from an employee's accrued paid leave even if the amount of time actually taken by the employee is marginally less than four (4) hours." Dkt. No. 49 ¶ 38. She also wrote that, while the Employee Handbook "does not directly speak to the issue of charging PTO for partial day absences of less than 4 hours," that "managers can, in their reasonable discretion, direct employees to be charged from their PTO for partial day absences of less than 4 hours." *Id.* ¶ 40. Indeed, the Employee Handbook is silent as to PTO for absences less than four hours. *See* Dkt. No. 58, Ex. A at 12

Plaintiff testified that, on June 29th, when she was not feeling well, she texted Remache to ask if she could leave work early and that Remache "insisted on asking [her] to submit PTO for . . . less than four hours." Dkt. No. 48-6 at 222. Plaintiff testified that she viewed this as discrimination "because if I have a doctor appointment with my pregnancy and I'm not feeling well, they will not allow me to go home early and they want me, the first thing they think about is to submit a PTO, not to care about my situation." *Id.* at 224. Plaintiff also stated that she had an issue with submitting PTO for that day because she "came in [at] 8:50 and left at 1:15 or 1:20" and was only required to take PTO for absences more than four hours. *Id.* at 301. There are emails in the record between Remache and Spesock, where Remache asked whether she should require Plaintiff to use PTO for this absence; Remache wrote:

Hey Sherry –

Question for you regarding Vivian. She isn't feeling well today, and she has decided to leave around 1:15PM. What is the protocol for ½ day? My understanding is if you come in at 8:30AM and don't take a lunch you can leave between 12:30–1PM. If you do take a lunch, then 1PM would be considered ½.

I told Vivian to just go ahead and leave. However, I wanted to make sure I discussed this with you to see if she should put PTO in. In my opinion, she should however I didn't want to go back and forth with her about this.

Thanks!

Amy

Dkt. No. 58, Ex. C.  Spesock replied, "Vivian normally comes in at 9 am (or close to it) and

leaves at 5 pm.  If she left at 1:15 pm, it should be considered as a half day of PTO."  *Id.*

Spesock submitted an affidavit that "June 29, 2018 was essentially on the eve of the biannual

convention, known as a pre-blackout date," and so "the Company was very busy in preparing for

the convention and normally denied requests for leave."  Dkt. No. 49 ¶ 41.  Spesock also testified

that she and Remache required Plaintiff to submit PTO on this date to avoid misuse of the policy.

Dkt. No. 48-7 at 75.  Remache stated that she advised Plaintiff to use PTO because she felt

Plaintiff was trying to "get away with not putting in the appropriate time" by negotiating her

departure time with Remache and because of discussions that Plaintiff "was not following the

policy for coming in at the office on time and leaving at the appropriate time."  Dkt. No. 48-9 at

77.  At her deposition, Plaintiff agreed that no one at Market America told her that she could not

attend a doctor's appointment in 2018.  Dkt. No. 48-6 at 281.

A few days after Plaintiff was told to use PTO when she left work early, Remache

emailed Plaintiff to ask her to submit her PTO.  *Id.*  Plaintiff continued to correspond with

Remache and MacCaull regarding the PTO, which Plaintiff apparently wanted to discuss with

Spesock.  Plaintiff wrote:

> Hi Amy,
> I submitted the PTO, but I still have questions.
> I have to go back to doctor next Monday but the earliest I can get is 9am.  I'm not
> sure if I can get back to office before noon.
> So when will be the cut off time that I have to submit PTO?
> The time line is very confused to me, that's why I want to talk to Sherry to clarify
> so I don't have to worry about it again . . . If you count my work hour from 9-5, its
> 8 hours and I eat on my desk.  That why I consider myself worked more than 4 hrs
> on Friday and the left time for work was 3.5 hr.  By the rules on the employee book,
> under 4 hrs absence don't need to submit PTO.

I know I have more appointments to come, I try my best to schedule it as early as possible but it's all depends on doctor's time. . . .

I do want you to explain to Sherry, since she doesn't response back to me most of the time, which is very frustrated.

So if we can make this clear, it will be very helpful to me.

Please advise, thanks for your help!

Best,
Vivian

*Id.* at ECF p. 2.

There are multiple instances in the record of Plaintiff leaving early or coming in late during her second pregnancy. On May 16, 2018, Plaintiff emailed Spesock to let her know that Plaintiff would be coming in late, to which Spesock replied "Got it. Thanks." *Id.* at 276. On May 29, 2018, Plaintiff sent an email to Remache explaining that Plaintiff had to leave work early to take her daughter to the doctor, to which Remache replied "Hey Vivian, no problem. . . . Hope she is feeling better." *Id.* at 282–83. During the blackout period in July of 2018, Plaintiff informed Spesock that she would be coming in late because she had a doctor's appointment, to which Spesock responded "Thanks for the heads up." *Id.* at 309–10.

At her deposition, Plaintiff was asked if she ever requested an "accommodation." Dkt. No. 48-6 at 212–13. In response, Plaintiff asked for clarification and, when Defendants' counsel asked if Plaintiff "ever request[ed] a reasonable accommodation under the Americans with Disabilities Act," Plaintiff responded that she filed a disability form in 2016 in connection with her maternity leave but otherwise never filed a form regarding a disability. Dkt. No. 48-6 at 213.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  And "[a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Village of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (internal quotation marks omitted).  "[I]n assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The party seeking summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  If the movant meets its burden, "the nonmoving party must come forward with admissible evidence to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  To survive summary judgment, the nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted), and must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).  But if "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied.  *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is

rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137.

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be

admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

## DISCUSSION

### I.     Motion for Summary Judgment

In support of their summary judgment motion, Defendants argue that Plaintiff's claims against Eagle Enterprises and Market America for discrimination and failure to accommodate under Title VII and the NYSHRL must be dismissed because Plaintiff: (1) did not seek an accommodation to work from home and did not identify others who were similarly situated and provided such accommodation; (2) cannot point to evidence that would allow a reasonable factfinder to conclude the Company discriminated against her based on her sex, gender, or pregnancy and cannot make out a *prima facie* case for workplace discrimination; and (3) the Company has articulated legitimate, non-discriminatory reasons for its decision to terminate Plaintiff's employment.  Dkt. No. 46 at 18–22.  Defendants also argue that Plaintiff's discrimination claims under the NYSHRL and NYCHRL against the individual defendants should be dismissed because (1) there is no discrimination for which an individual may be held liable under those statutes; (2) the individual defendants have no ownership in the Company and so could not be held liable as an "employer"; and (3) Plaintiff's allegations are that the individual defendants are liable for aiding and abetting their own conduct, rather than some other person's conduct.  *Id.* at 23–25.  Finally, Defendants argue that Plaintiff's claims fail under the NYCHRL because she did not identify any comparator who was allowed to work from home or use PTO differently

A. **Plaintiff's Title VII and NYSHRL Discrimination and Failure-to-Accommodate Claims**

Defendants argue that Plaintiff's discrimination claims under Title VII and NYSHRL, which are analyzed in tandem as against Eagle Enterprises and Market America, fail because she has not shown that the adverse employment actions occurred under circumstances giving rise to an inference of discrimination. They argue that, even if Plaintiff had established a *prima facie* case of discrimination, the Company met its burden in articulating legitimate, non-discriminatory reasons for its decision to terminate Plaintiff's employment and the Plaintiff has not rebutted this with any evidence to show that the non-discriminatory reasons were pretextual. As to Plaintiff's failure-to-accommodate claims, Defendants contend that Plaintiff testified that she never sought an accommodation, that working from home was not supported by Company policy, and that Plaintiff has not identified any similarly situated employees who were granted accommodations.

Plaintiff responds that she has established a *prima facie* case of discrimination and failure to accommodate. She argues that when she informed Defendants that she was pregnant and requested maternity leave and an accommodation to work from home due to her pregnancy, Defendants did not provide requested information to Plaintiff or help her process her maternity leave and required her to use PTO to attend a pregnancy-related medical appointment when she was not required to do so before informing Defendants that she was pregnant. Plaintiff also argues that Defendants' proffered reason for terminating Plaintiff is false and pretextual.

The Pregnancy Discrimination Act of 1978 amended Title VII to make explicit that employment discrimination because of sex includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). It goes on to require that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but

similar in their ability or inability to work." *Id.* "Like other Title VII discrimination claims, pregnancy discrimination may be proven under a disparate treatment or disparate impact theory of liability." *Legg v. Ulster Cty.*, 820 F. 3d 67, 72 (2d Cir. 2016). Plaintiff's theory is that she was treated differently from others on account of her sex, gender, and pregnancy. Thus, "[t]o establish disparate treatment, a plaintiff must show that the defendant's actions were motivated by a discriminatory intent, either through direct evidence of intent or by utilizing the three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id.* (citing *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 65 (2d Cir. 1995)). "The plaintiff has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her on account of her pregnancy." *Quaratino*, 71 F.3d at 63. For present purposes, "'claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (quoting *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997)); *see also Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 323–24 (S.D.N.Y. 2020) ("Claims under both Title VII and the NYSHRL, including sex and pregnancy discrimination, are generally treated as analytically identical, and addressed together. Both are governed by the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green* . . ." (internal quotation marks and citations omitted)).

The *McDonnell Douglas* framework requires a plaintiff to first prove, by a preponderance of the evidence, a *prima facie* case of discrimination. 411 U.S. at 802. "A plaintiff can establish a *prima facie* case of pregnancy discrimination under Title VII by showing that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) [either] her position remained open and was ultimately filled by a

non-pregnant employee . . . [or] the discharge occurred in circumstances giving rise to an inference of unlawful discrimination."  *Quaratino*, 71 F.3d at 64; *see also Saraf v. West Publishing Corp.*, 2018 WL 7107266, at *3 (S.D.N.Y. Dec. 20, 2018) ("To set forth a prima facie case of discrimination, a plaintiff must show (1) she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination."). Similarly, "a plaintiff alleging that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act's second clause may make out a prima facie case by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought an accommodation, that the employer did not accommodate her, and that the employer did accommodate others 'similar in their ability or inability to work.'"  *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015).  "The burden of making [a *prima facie*] showing is 'not onerous,'" *id.* at 228 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), and "an individual plaintiff may establish a prima facie case by 'showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under' Title VII," *id.*

If plaintiff makes this showing, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its policy or action."  *See Legg*, 820 F.3d at 73; *see also Quaratino*, 71 F.3d at 64 ("[A]ssuming the plaintiff demonstrates a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason for discharging the employee.").  "This burden is one of production, not persuasion," and it can be met "by offering admissible evidence sufficient for the trier of fact

to conclude that the [plaintiff] was fired" for the nondiscriminatory reason. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). Even so, for failure-to-accommodate claims, the employer's legitimate, non-discriminatory reason "normally cannot consist simply of a claim that it is more expensive or less convenient to add pregnant women to the category of those . . . whom the employer accommodates." *Young*, 575 U.S. at 229. If the employer articulates a legitimate, non-discriminatory reason for failing to accommodate the pregnant employee or for discharging her, the plaintiff then has the ultimate burden to prove, by a preponderance of the evidence, that the employer's reason was really a pretext and that the decision was based, at least in part, on discrimination based on the plaintiff's pregnancy. *See Quaratino*, 71 F.3d at 64; *Legg*, 820 F.3d at 74. The non-discriminatory justification may be rebutted "through circumstantial proof of discriminatory intent," *Legg*, 820 at 74, and, "although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual," *Reeves*, 530 U.S. at 143 (internal quotation marks and citations omitted) (alteration adopted). In the accommodation context, "a plaintiff can make this showing [of pretext] by presenting 'sufficient evidence that the employer's policies impose a *significant burden* on pregnant workers, and that the employer's legitimate, nondiscriminatory reasons are not *sufficiently strong* to justify the burden, but rather—when considered alongside the burden imposed—give rise to an inference of intentional discrimination.'" *Legg*, 820 at 74 (alterations adopted) (quoting *Young*, 575 U.S. at 229).

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at

253.  "If the defendant articulates a non-discriminatory reason, the *McDonnell Douglas* burden-shifting framework drops out of the picture, and the plaintiff must show that the adverse employment decision more likely than not was motivated in whole or part by discriminatory reasons."  *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 512 (2016).  An employee need not ultimately "show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. . . . It suffices instead to show that the motive to discriminate was *one of the employer's motives*, even if the employer also had other, lawful motives that were causative in the employer's decision."  *Lenzi*, 944 F.3d at 107 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013)).  That is, "even if an employer can establish that legitimate, non-discriminatory reasons also provided sufficient reason for the adverse action, the employer may still be liable under Title VII."  *Naumovski v. Norris*, 934 F.3d 200, 213.  "[A] Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action."  *Id.* at 214.

### 1.    *Prima facie* case

The parties do not dispute that Plaintiff, as a pregnant woman, belonged to a protected class under Title VII.  In support of its motion for summary judgment on Plaintiff's wrongful termination claim against Eagle Enterprises and Market America, Defendants appear to contest only whether the fourth prong of the *prima facie* test for wrongful termination has been met; they argue that "Plaintiff . . . cannot point to any evidence that would allow a reasonable factfinder to conclude that the Company discriminated against her based upon her sex, gender, or pregnancy." Dkt. No. 46 at 19.  Plaintiff disagrees.  She argues that "Defendants completely failed to help Plaintiff process her maternity leave and treated Plaintiff different [sic] than her non-pregnant coworkers, before deciding to terminate Plaintiff only six weeks after she informed Spesock that she was pregnant and would need to take maternity leave and approximately one month after she

sought a pregnancy-related accommodation to work from home." Dkt. No. 56 at 16.  According to Plaintiff, these facts give rise to an inference of discrimination sufficient to establish a *prima facie* case of discrimination.

As a threshold matter, Plaintiff appears to be arguing that, in addition to being denied an accommodation for her pregnancy by being denied the opportunity to work from home, she suffered multiple adverse employment actions.  As the Court reads Plaintiff's argument, these adverse actions are: (1) Plaintiff being required to take PTO when she left work for pregnancy-related reasons instead of being allowed to work from home or simply leave work early or arrive late, and (2) Plaintiff being terminated.  "A plaintiff suffers an adverse employment action when he 'endures a materially adverse change in the terms and conditions of employment.'"  *Harge v. City of New York*, 2021 WL 3855305, at *8 (S.D.N.Y. Aug. 26, 2021) (alteration adopted) (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)).  Adverse employment actions include demotions, loss of wages, and material losses of benefits.  *See id.* at *8–10 (collecting cases); *see also Henry v. NYC Health Hosp. Corp.*, 18 F. Supp. 3d 396, 405 (S.D.N.Y. 2014) (explaining that plaintiff who was "removed from the roll call and sent home" but was not "docked pay on that particular day" did not suffer an adverse employment action); *Mazyck v. Metropolitan Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012) (concluding that "denial of overtime can constitute an adverse employment action").

Termination is plainly an adverse employment action; whether the requirement that Plaintiff use her PTO for a partial-day absence constitutes "a materially adverse change in the terms and conditions of employment," *Brown*, 673 F.3d at 150, is a closer question.  For present purposes, the Court will assume without deciding that Plaintiff's required use of her limited accrued PTO, which has a close analogue to being docked pay, does constitute an adverse

27

employment action. *Cf. Reichert v. Perdue*, 786 F. App'x 294, 297 (2d Cir. 2019) (summary order) ("We need not decide whether Reichert's reassignment was an adverse employment action because, even assuming that Reichert presented sufficient evidence to establish a prima facie case of discrimination, the USDA offered ample evidence of a legitimate, non-discriminatory basis for Reichert's reassignment, and Reichert failed to demonstrate a triable issue of fact as to whether the explanation was a pretext for sex or age discrimination.").

The Court first considers whether these adverse employment actions occurred in circumstances giving rise to an inference of discrimination and then considers whether Plaintiff has met her burden to show a *prima facie* case for her failure-to-accommodate claim.

### a.    Adverse Employment Actions

The temporal proximity between a plaintiff's disclosure of her pregnancy and the adverse employment actions may raise an inference of discrimination sufficient to meet the "'de minimis' burden of making out a prima facie case" of discrimination. *Saraf*, 2018 WL 7107266, at *6; *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 108 (2d Cir. 2019) (holding that district court committed error in holding forth prong of *prima facie* case was not met where there was a two-week period between when plaintiff disclosed pregnancy and termination). Courts in this district have found that a period of approximately one month between a plaintiff's disclosure of her pregnancy and the plaintiff's termination is "sufficient to give rise to an inference of discrimination." *Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425, 431 (S.D.N.Y. 2000); *see also Farmer*, 473 F. Supp. 3d 309, 327 (S.D.N.Y. 2020) (holding that plaintiff plead a *prima facie* case of sex discrimination where "[l]ittle over a month passed between" the time that plaintiff disclosed she was pregnant and the time she was fired and noting that "[t]his falls well within the two-month period in which courts frequently find a plausible inference of causation in discrimination cases); *Klausner v. Indus. Risk Insurers, Inc.*, 1999 WL 476285, at *4 (S.D.N.Y.

July 8, 1999) (concluding that "the temporal proximity between the time [defendant] learned of plaintiff's pregnancy, the time an inquiry was made and [defendant] formed the belief that her pregnancy was 'high risk,' and the time of her discharge is sufficient to support an inference of discrimination," where there was a month between defendant learning of plaintiff's pregnancy and her termination and ten days or less between defendant learning her pregnancy was "high risk" and her termination).

It is undisputed that Plaintiff informed her supervisor that she was pregnant "[i]n or around April 2018." Dkt. No. 55 ¶ 16. It is also undisputed that head of HR, Spesock, was not informed that Plaintiff was pregnant until June 12, 2018, *id.* ¶ 19, and that the decision to terminate Plaintiff was made after discussions with multiple people, including Remache and Spesock, *id.* ¶ 92. Plaintiff was told she was terminated on July 24, 2018. *Id.* ¶ 30. The actual decision to terminate her was made on or about July 2, 2018, subject to legal review. *See* Dkt. No. 48-7 at 105–07 (Spesock testifying that she met with Remache on July 2, 2018 to discuss releasing the designers and then spoke to legal before approving the decision to terminate the five designers). The relatively close temporal proximity—a period of weeks—between the time that one of the individuals involved in the decision to terminate Plaintiff became aware that Plaintiff was pregnant and actually terminated her may give rise to an inference of discrimination. Although this evidence alone would be sufficient for Plaintiff to meet the minimal burden of showing an inference of discrimination surrounding her termination, there is additional undisputed evidence that the Court is prepared to assume supports this inference as well.[4] *Cf.* Dkt. No. 16. After Plaintiff was terminated, and admittedly in response to Plaintiff's

---

[4] In ruling on the motion to dismiss, Judge Engelmayer held that the alleged circumstances surrounding her termination could give rise to an inference of unlawful discrimination and noted that the termination occurred "four months after informing Market America that she was

own complaint that Market America's decision was based on her pregnancy, Remache sent an e-mail to Spesock, where she wrote, among other things:

> In a professional environment, an Employee should not use their pregnancy, a personal decision, interfere with her responsibilities at their job. Since she was the one who brought up her pregnancy during today's meeting, it shows that her only priority and focus is that and not providing the best design, motivation or quality of work to the team. Vivian made our meeting and releasing decision personal by that up.

Dkt. No. 58, Ex. G. The statement was made only after Plaintiff accused Remache of discrimination and only in response to that accusation. *See* Dkt. No. 48-9 at 108 (Remache testifying that, during the conversation at which Plaintiff was terminated, Plaintiff "was the one who brought up that she was pregnant, and then she was going to sue the company" and that Plaintiff "brought up the fact that we couldn't release her because she was pregnant"). Drawing all inferences in Plaintiff's favor, the Court assumes a jury could conclude that Remache's statement, made so soon after the decision to terminate Plaintiff's employment and regarding Plaintiff's focus being on her pregnancy and not on her work, further supports the inference that Remache believed at least at some point that Plaintiff's poor work performance was related to her pregnancy.

There was also approximately two weeks between Spesock's learning of Plaintiff's pregnancy and Plaintiff being required to take PTO for an absence of just under four hours when she left early on June 29th, and there is evidence in the record that Spesock played a role in the decision to require Plaintiff to take PTO. *See* Dkt. No. 58, Ex. C. This temporal proximity is

---

pregnant, and with her maternity leave becoming imminent." Dkt. No. 16 at 9. The Court does not read Judge Engelmayer's opinion to suggest that an adverse employment action taken four months or less of an employer finding out that an employee is pregnant will always be sufficient to give rise to an inference of discrimination.

sufficient for Plaintiff to met her "minimal" burden of establishing a *prima facie* case of employment discrimination for her being required to take PTO.  *Lenzi*, 944 F.3d at 107.

### b.      Failure to Accommodate

With respect to Plaintiff's failure-to-accommodate claim, however, the Court concludes that, in light of the undisputed facts and drawing all inferences in favor of Plaintiff as the non-moving party, Plaintiff has not made out a *prima facie* case.  To establish a *prima facie* case of pregnancy discrimination claim based on an employer's failure to accommodate, a plaintiff must show both that she sought an accommodation and that the employer did not accommodate her while accommodating others that were similarly situated.  Defendants argue that Plaintiff never actually requested an accommodation for her pregnancy, while Plaintiff contends that "the record clearly indicates that Plaintiff sought an accommodation to work from home in relation to her pregnancy."  Dkt. No. 56 at 14.  In her declaration, Plaintiff states that "[a]round June 18, 2018, [she] contacted Remache to inform her that [she] had a pregnancy-related doctor's appointment and to request to work from home following the appointment."  Dkt. No. 57 ¶ 35. This largely repeats Plaintiff's deposition testimony that:

> [Remache] knows I was pregnant since April 2018, so she knows I have tons of doctor appointment, . . . on June 18 when I had a doctor appointment, when I asked her if I could work from home after, which we always do when there is something happened like previously, we're allowed to work from home for these kind of absence . . . .

Dkt. No. 48-6 at 214.  When asked directly if she ever requested an accommodation, Plaintiff asked for clarification, and her response indicated that she did not fully understand the question. *Id.* at 213.  The Court need not decide whether Plaintiff's request to work from home after her appointment could be construed as an accommodation request because, even if it could be, Plaintiff has not established a *prima facie* case.  That is because there is no evidence from which a reasonable jury could find that Defendants "did accommodate others similar in their ability or

inability to work." *Young*, 575 U.S. at 229 (internal quotation marks omitted).  Defendants submitted evidence that there was an across-the-board restriction against working from home unless the employee was sick or injured.  Plaintiff testified that someone else was permitted to work from home, but she provides no detail that would allow a factfinder to conclude that this person was similarly situated in his or her ability to work.  Without such facts, Plaintiff cannot sustain her failure-to-accommodate claim.

## 2. Defendants' Non-Discriminatory Rationale

Defendants have set forth a legitimate, non-discriminatory justification for terminating Plaintiff.  It is undisputed that Plaintiff was terminated as part of a reduction in force in which four other members of the design team also had their employment terminated and that this resulted in termination of approximately half of the design team at that time.  Dkt. No. 55 ¶ 30.  It is also undisputed that Remache emailed Spesock and explained that she wanted to release the designers as part of a restructuring initiative and that each of these designers had performance reviews that were similarly rated to Plaintiffs.  *Id.* ¶¶ 24, 28. "[M]ultiple courts have found that a reduction-in-force effort—as established by the record here—is a valid, non-discriminatory reason to terminate an individual's employment."  *Saraf*, 2018 WL 7107266, at *7.

There is also extensive evidence in the record to support Defendants' conclusion at the time of her termination that Plaintiff's performance was lackluster at best.  In her most recent performance review—made before anyone at the Company knew that she was pregnant—she did not receive a single "Exceeds Expectations" rating for any of the categories assessed, and she was told that she should improve her attendance.  There is evidence that other employees had concerns with her work and that the jobs she was given were limited as a result.  *See, e.g.*, *id.* ¶¶ 28, 29; Dkt. No. 58, Ex. G.

Defendants have also put forth undisputed evidence that, while the Employee Handbook did not require Plaintiff to take PTO for her 3.5 or 3.75-hour absence on June 29th, her managers were permitted to direct her to do so and, in fact, did so for a legitimate reason.  Spesock testified that she typically required her staff to use PTO for partial-day absences when they worked fewer than five hours, which Plaintiff did.  She also explained, in a sworn affidavit, that the Company "follow[s] the New York City Paid Safe and Sick Leave Law, which allows employers to debit four (4) hours of PTO from an employee's accrued paid leave even if the amount of time actually taken by the employee is marginally less than four (4) hours."  Dkt. No. 49 ¶ 38.  Plaintiff does not point to anything that could put in dispute that Remache had the discretion to require PTO for absences that are just under four hours.  Nor does she proffer any evidence to dispute the reasons that supported requiring Plaintiff to take PTO on June 29th—that it was necessary to avoid Plaintiff abusing Company policy, Dkt. No. 50 ¶¶ 35, 37, to maintain consistency among other employees, Dkt. No. 49 ¶ 44, or because it was during a very busy time for the Company and leave requests were generally denied, *id.* ¶ 41.

The evidence in the record demonstrates that there is no genuine dispute that Defendants had legitimate, non-discriminatory reasons both for terminating Plaintiff and for requiring her to take PTO for her absence on June 29th (the only absence for which Plaintiff has provided any detail).  The burden thus shifts back to the Plaintiff to show that these reasons were, in fact, pretextual and that the adverse actions were motivated by discrimination.

### 3.       Whether the Rationale was Pretextual

Once an employer "has made a showing of a neutral reason for the complained of action, to defeat summary judgment . . . the [employee's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination."

*Kirkland v. Cablevision Sys.,* 760 F.3d 223, 225 (2d Cir. 2014) (alterations in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

Here, there is no evidence that Plaintiff's termination or the requirement that she use PTO for her absence on June 29th was pretextual. As for Plaintiff's termination, Defendants have set forth overwhelming evidence that Plaintiff was terminated in light of her relatively poor performance and as part of a reduction-in-force effort during which multiple other individuals with similar performance ratings were also let go. *See Philpott v. State Univ. of N.Y.*, 805 F. App'x 32, 34 (2d Cir. 2020) (summary order) (affirming grant of summary judgment in favor of defendant where plaintiff "failed to adduce sufficient evidence to raise a material dispute of fact that [defendant's] stated reasons for termination were pretextual" and defendant "adduced overwhelming evidence that [plaintiff] was terminated after declining work performance, extensive absences from the office during business hours, and insubordination in connection with his emergency leave request").

While Plaintiff repeatedly states that the reasons proffered for her termination were not the real reasons, she does not point to any evidence that could rebut the Defendants' reasons or from which a jury could conclude that Defendants were, in fact, motivated by discrimination. *Id.* ("[Plaintiff] failed to offer any evidence rebutting the proffered reasons or suggesting that [defendant] was, in fact, motivated by discrimination."). For example, Plaintiff repeatedly refers to the performance review that she received before Remache knew Plaintiff was pregnant as "glowing and positive," Dkt. No. 57 ¶ 5; Dkt. No. 56 at 4, 23, 27, but it is undisputed that she did not receive a single "Exceeds Expectations" rating and that she received only "Meets Expectations" or "Needs Improvement" ratings. They are not inconsistent with the reasons asserted by Market America at the time for Plaintiff's termination. It is also undisputed that the

other individuals who were terminated as part of the reduction-in-force effort and had annual reviews had received similar or, in one case, better ratings than Plaintiff.  "A party cannot defeat a motion for summary judgment with conclusory allegations or unsubstantiated speculation."  *Fu v. Con. Edison Co. of N.Y., Inc.*, 855 F. App'x 787, 790 (2d Cir. 2021) (summary order) (internal quotation marks omitted).

This conclusion is not altered by Remache's statement in her email, sent after Plaintiff was terminated, that "[s]ince [Plaintiff] was the one who brought up her pregnancy during today's meeting, it shows that her only priority and focus is that, and not providing the best design, motivation, or quality of work to the team."  Dkt. No. 58, Ex. G.  While the Court was prepared to assume that this statement, coupled with the temporal proximity of Plaintiff's termination and the disclosure of her pregnancy to Spesock, could give rise to an inference of discrimination, it does not establish that Market America's asserted reasons were pretextual. Each of Spesock, MacCaull, and Remache testified that she did not discuss Plaintiff's pregnancy with anyone before deciding to terminate Plaintiff.  *See* Dkt. No. 48-7 at 117 (Spesock); Dkt. No. 48-8 at 113 (MacCaull); Dkt. No. 48-9 at 172 (Remache).  Reading Remache's email in context, as the Court is required to do at summary judgment, it reflects that that Remache was responding to an accusation made by Plaintiff at the meeting where Plaintiff's termination was announced to her.  It does not reflect that the decision to terminate her employment, which was made before the announcement, was pretextual.  To the contrary, the email itself contains the extensive reasons for Plaintiff's termination including poor performance, not following proper protocol with respect to attendance and working from home, a lack of initiative and motivation, poor communication with the team, lack of trust in her work leading to requests for other designers, and work on side projects without communicating such work to her managers.  Dkt. No. 58, Ex.

G.  There is no evidence that those concerns were "unworthy of credence," *Saraf*, 2018 WL 7107266, at *4 (internal quotation marks and citations omitted), or that the termination was, in fact, "more likely motivated by discrimination," *Sgarlata v. Viacom, Inc.*, 2005 WL 659198, at *4 (Mar. 22, 2005); *see also Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 394 (S.D.N.Y. 2012) (explaining that allegations that plaintiff was fifty-six years old and female cannot support discrimination claims "particularly in the context of a group-termination [reduction in force]"); *Pisana v. Merril Lynch & Co.*, 1995 WL 438715, at *3 (S.D.N.Y. July 24, 1995) (explaining that courts "place a greater burden on plaintiffs in [reduction-in-force] cases to prove an intent to discriminate").  "Employers are free to terminate employees for subjective business judgments so long as their actions are not taken for discriminatory reasons." *Pisana*, 1995 WL 438715, at *4.  Defendants have offered legitimate reasons why Plaintiff was included in the reduction-in-force effort, and, in light of these reasons, a reasonable jury could not read the evidence, including Remache's email, to mean that Plaintiff's pregnancy motivated the decision to terminate her.

Nor could a reasonable jury conclude that the requirement that Plaintiff use PTO for her absence on June 29th was motivated by discrimination.  Plaintiff has not offered any evidence that would undermine the reasons that Defendants provided for requiring her to take PTO that day, including that requiring her to take PTO when she worked less than five hours was in accordance with the practice applicable to other employees, Dkt. No. 49 ¶ 41, that it was a busy time and that leave requests were typically denied at this time, *id.* ¶ 40, and that Remache and Spesock thought it was necessary to avoid misuse of company policy, *see* Dkt. No. 48-7 at 75; Dkt. No. 48-9 at 77.  Nor has she provided evidence that requiring her to take PTO is "in direct contravention" of the Company's policy, Dkt. No, 57 ¶ 47, which states that PTO will be taken

36

for absences beyond four hours and is silent as to absences for less than that.  She simply asserts

that, before she was pregnant, she was not required to take PTO to attend a doctor's visit, *id.*, but

she provides no detail about the length of time of those doctor's visits, when in the day they

occurred, or whether they occurred on the eve of the Company's "blackout" period.  Plaintiff

provides no evidence from which a reasonable jury could find that the Defendants were

motivated by discrimination in requiring Plaintiff to take PTO for her 3.5 to 3.75-hour absence

from work.  *See Harge*, 2021 WL 3855305, at *15 (denying summary judgment on

discrimination claim where "[p]laintiff has not proffered any evidence to suggest that this was

not typical protocol, or that other similarly situated officers . . . would not have received the

same treatment and penalties").

       Because the undisputed facts show that Plaintiff cannot carried her burden to demonstrate

that the adverse employment actions taken against her were motivated by discrimination and not

the legitimate justifications that were proffered, Defendants are entitled to summary judgment on

their Title VII and NYSHRL claims as against all parties.  *See Santiago v. Axis Spexialty U.S.*

*Servs., Inc.*, 2021 WL 639527, at *13 (stating that "'liability under the NYSHRL . . . must first

be established as to the employer/principal' before an individual may be held liable" under that

law (alteration adopted) (quoting *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490

(S.D.N.Y. 1999)).

       **B.**    **Plaintiff's NYCHRL Claims**

       "Courts must analyze NYCHRL claims separately and independently from any federal

and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to

the extent that such a construction is reasonably possible.'"  *Ya-Chen Chen v. City University of*

*New York*, 805 F.3d 59, 75 (2d Cir. 2015) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am.,*

*Inc.*, 715 F.3d 109, 109 (2d Cir. 2013)).  However, even under this broad analysis, "the plaintiff

must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions. If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Id.* at 76 (internal quotations omitted); *see also Williams v. Regus Management Group,* LLC, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011) (noting that "for both discrimination and retaliation claims under the NYCHRL, courts continue to apply the three-step, burden-shifting framework that the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*").   In other words, "under the NYCHRL, 'the plaintiff need only show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons. . . .  [The defendant] is entitled to summary judgment on this basis only if the record established as a matter of law that discrimination played *no* role in its actions."  *Santiago*, 2021 WL 639527, at *12 (quoting *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013)).  While "claims under the NYCHRL are more liberally construed than claims under Title VII . . . , the NYCHRL does not alter the kind, quality, or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56."  *Williams*, 836 F. Supp. 2d at 170–71 (internal quotation omitted).

## 1.    Discrimination

Plaintiff's discrimination claims fail even under the broader NYCHRL analysis.  Plaintiff asserts that she was discriminated against under the NYCHRL because "her requests for information and efforts to obtain leave were either consistently ignored or actively obstructed," "Defendants did not allow Plaintiff to work from home on days that she needed to attend pregnancy-related medical appointments, in stark contrast with her non-pregnant colleagues that were allowed to work from home," and "Defendants forced Plaintiff to charge paid time off to

attend a pregnancy-related medical appointment in direct contravention with their position before Plaintiff's pregnancy and their own written policy . . . ." Dkt. No. 56 at 17. These arguments largely recycle the arguments made in favor of the Title VII and NYSHRL claims. As explained above, Plaintiff has not pointed to any evidence that could rebut Defendants' evidence of legitimate and non-discriminatory reasons for the actions they took and, with respect to her requests to work from home, has not provided evidence from which a jury could find that she was treated differently from a similarly situated person. Absent such evidence, a jury could not return a verdict for Plaintiff. *See Harge*, 2021 WL 3855305, at *15.

With respect to Plaintiff's assertion that she was discriminated against because her requests to obtain information regarding her leave were ignored or obstructed, that fact is belied by the record. There are multiple emails between Plaintiff and members of the HR team that show that they were assisting Plaintiff with the process of obtaining maternity leave, notwithstanding the fact that the leave was handled by an external administrator, even if some emails received delayed responses. And "[e]ven under the more liberal standards of the NYCHRL, the plaintiff must still present some evidence of discriminatory animus." *Santiago*, 2021 WL 639527, at *12. Plaintiff has not put forth "a single comment or incident suggesting that discriminatory motives caused" Defendants to delay the processing of Plaintiff's maternity leave or otherwise fail to respond to her emails regarding leave in a manner she considered sufficiently timely. *Id.*

### 2. Retaliation

The NYCHRL defines retaliation in a manner that "is broader than its federal and state counterparts." Dkt. No. 16 at 18. It "prohibits employers from 'retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden under this chapter.'" *Mihalik*, 715 F.3d at 112 (alteration in original) (quoting N.Y.C. Admin.

Code § 8-107(7)).  "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in action . . . ."  *Id.*  Challenged conduct may not be deemed nonretaliatory "unless 'a jury could not reasonably conclude from the evidence that such conduct was . . . "reasonably likely to deter a person from engaging in protected activity."'"  *Id.* (alteration in original) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 335 (1st Dep't 2009).  Other than requiring a showing that something was "reasonably likely to deter a person from engaging in protected activity" rather than an "adverse employment action," "a *prima facie* case of retaliation faces the same requirements under the NYCHRL as under the NYSHRL."  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012).  The burden to show that Defendants retaliated against Plaintiff is similar to that required for state and federal claims:

> [A]t trial, the plaintiff still bears the ultimate burden of establishing a prima facie case of retaliation under the NYCHRL.  In this regard, to make out an unlawful retaliation claim under the NYCHRL, a plaintiff must show that (1) he or she engaged in a protected activity as that term is defined under the NYCHRL, (2) his or her employer was aware that he or she participated in such activity, (3) his or her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct . . . .  Once the plaintiff has met this initial burden, the burden then shifts to the defendant to present legitimate, independent, and nondiscriminatory reasons to support its actions . . . .  Then, if the defendant meets this burden, the plaintiff has the obligation to show that the reasons put forth by the defendant were merely a pretext.

*Brightman v. Prison Health Serv., Inc.*, 970 N.Y.S.2d 789, 791 (2d Dep't 2013).

Plaintiff argues that she was terminated "merely six weeks after she informed Spesock that she was pregnant and would need to take maternity leave and approximately one month after Plaintiff sought a pregnancy-related accommodation to work from home."  Dkt. No. 56 at 20.  She also argues that she "can rely on the fact that non-pregnant employees were treated

differently because they were allowed to work from home, to establish a causal connection." Dkt. No. 56 at 20 (citing *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015). As explained above, Plaintiff has not provided any evidence from which a jury could find that Plaintiff was treated differently from a similarly situated employee with respect to working from home. *See Littlejohn*, 795 F.3d at 319 ("A causal connection in retaliation claims can be shown . . . through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct."). Nor is the denial of her request to work from home—if there was, in fact, a request—the sort of "conduct that is reasonably likely to deter a person from engaging in . . . protected activity." *Brightman*, 970 N.Y.S.2d at 791.

Plaintiff also argues that she "can rely on temporal proximity between her protected activities and her unlawful termination to establish causation." *Id.* In support, she cites *McHenry v. Fox News Network, LLC*, 2020 WL 7480622, at *11 (S.D.N.Y. Dec. 18, 2020), in which a court found that an inference of causation was plausibly plead based on temporal proximity. But even assuming that Plaintiff can establish a *prima facie* case of retaliation for her termination, her claim fails for the same reasons that her state and federal discrimination claims fail—Defendants have set forth "legitimate, independent, and nondiscriminatory reasons" for terminating Plaintiff, and Plaintiff has not shown that these reasons are a pretext. Defendants are entitled to summary judgment on Plaintiff's NYCHRL retaliation claim.

### 3.   PWFA

The PWFA provides that:

> It shall be an unlawful discriminatory practice for an employer to refuse to provide a reasonable accommodation, as defined in section 8-102, to the needs of an employee for the employee's pregnancy, childbirth, or related medical condition that will allow the employee to perform the essential requisites of the job, provided that such employee's pregnancy, childbirth, or related medical condition is known or should have been known by the employer.

N.Y.C. Admin. Code § 8-107(22).  Plaintiff argues that Defendants are not entitled to summary judgment because "Defendants denied Plaintiff's reasonable accommodation request to work from home on days that she needed to attend pregnancy-related medical appointments to allow her to continue working during her pregnancy, in stark contrast with Plaintiff's non-pregnant colleagues that were allowed to work from home" and that "Defendants['] decision to terminate Plaintiff only six weeks after she informed Spesock that she was pregnant and would need to take maternity leave constitute the denial of a reasonable accommodation to facilitate Plaintiff's childbirth."  Dkt. No. 56 at 19.

There is no evidence from which a reasonable jury could conclude that Defendant's refused to provide Plaintiff a reasonable accommodation "that will allow [her] to perform the essential requisites of the job."  N.Y.C. Admin. Code § 8-107(22).  Plaintiff has not put forth any evidence that suggests that working from home after doctor's appointments were necessary to allow her to perform her work.  Rather, the evidence tends to show that Plaintiff requested the accommodation so that she could attend doctor's appointments in a manner that was more convenient and comfortable to her.  She did not provide evidence that she could not work in the office before or after a doctor's appointment or that she could not take PTO to accommodate her commute or doctor's appointments that were incompatible with her work schedule.  Because there is no evidence from which a jury could find that working from home was necessary for Plaintiff to "perform the essential requisites" of her job, Defendants are entitled to summary judgment on this claim.

### 4.   Employer Liability

The NYCHRL imposes liability of an employer for discriminatory acts of certain employees.  *Zakrzweska v. New Sch.*, 928 N.E.2d 1035, 1039 (N.Y. 2010); N.Y.C. Admin. Code § 8-107(13).  However, none of Plaintiff's claims against Defendants survives, and absent a

discriminatory act, there can be no employer liability.  Defendant is entitled to summary judgment on this count as well.

## II.      Motion to Preclude Expert Testimony

On January 5, 2021, Plaintiff submitted a notice pursuant to Federal Rule of Civil Procedure 26(a)(2)(A) that disclosed that she expects to call Dr. Frankel as an expert witness at trial.  Dkt. No. 44-1 at ECF p. 2.  Attached to that notice was the expert report of Dr. Frankel, dated June 8, 2020, *id.* at ECF pp. 3–21, as well as Dr. Frankel's Curriculum Vitae ("CV"), *id.* at ECF pp. 22–29.  In the report, Dr. Frankel explained that she interviewed Plaintiff on June 5, 2020, by videoconference for a psychological evaluation in connection with the instant litigation. *Id.* at ECF p. 4.

The report recounted Plaintiff's answers to a number of background questions regarding Plaintiff's education, employment history, and history of psychiatric treatment.  It stated that Plaintiff was given a number of psychological tests related to depression, anxiety, malingering, and post-traumatic stress disorder.  *Id.* at ECF p. 10.  These tests were nearly all self-report surveys.  Plaintiff's answers to the Depression, Anxiety, Stress Scale, yielded results that placed Plaintiff "in the severe range on the Depression scale," "in the extreme severe range on the Anxiety scale," and "in the severe range on the Stress scale."  *Id.* at ECF p. 11.  On the Beck Depression Inventory II, Plaintiff's responses put her in the range for severe depression, and on the Beck Anxiety Inventory, her responses put her in the severe anxiety range.  *Id.*  On the Hamilton Rating Scale for Depression, Plaintiff's score placed her in the "very severe depression range."  *Id.*  The Rotter Incomplete Sentence Blank, which asks a subject to finish a sentence for which the first word(s) are supplied, yielded results that Dr. Frankel noted "reflect a person who is depressed and feels she suffers a lot."  *Id.* at ECF p. 12.  Plaintiff's responses to the Posttraumatic Stress Disorder Symptom Scale Interview for DSM-5 reflected that Plaintiff

"meets criteria to consider a post-traumatic stress diagnosis." *Id.* at ECF p. 13.  Dr. Frankel also

administered a memory test that is used to measure malingering and explained that the results of

that test "suggests [Plaintiff] was putting forth appropriate effort and was not engaging in

malingering." *Id.* at ECF p. 12.

The report also outlined relevant medical records that Plaintiff provided to Dr. Frankel.

Treatment notes from Plaintiff's sessions with a Dr. Karen Jason, whom Plaintiff saw

intermittently from August 2018 to June 2020, indicates that the initial diagnosis, present

throughout the sessions, was Generalized Anxiety Disorder.  *Id.* at ECF p. 13.  In her report, Dr.

Frankel explains that the treatment notes from Dr. Jason "highlight the strong negative impact

the termination had on [Plaintiff's] emotional wellbeing." *Id.* at ECF p. 14.  She also opines that

Plaintiff, though initially diagnosed with Generalized Anxiety Disorder, "should have been

diagnosed with an Anxiety Disorder at that time" because "[s]he presented for treatment soon

after she was terminated thus at that time she had not experienced the symptoms for six months,

the criteria for [Generalized Anxiety Disorder]." *Id.*

In the report, Dr. Frankel offered a qualitative analysis, a commentary, and diagnoses.

The "qualitative analysis" section states:

> Ms. Xiang's interview responses present the ongoing anxiety that her experiences
> at Eagle have triggered for her.  The upcoming mediation has retriggered her
> symptoms.  She continues to feel detached from people.  She continues to feel
> anxious about her future.  She is afraid of her employers, future employers and
> whether she will have other discrimination experiences and experiences of hostile
> environments.  Two years have passed but she has a sustained impact of the Eagle
> discrimination and hostile environment experiences.  Once someone leaves a
> negative situation one might expect to have a new experience, to start afresh.
> However, to still have this persist is an indicator of the severity of the initial
> experience.  A person should not have their enjoyment of work, and thus enjoyment
> of life be negatively impacted.

*Id.* at ECF p. 14.  The "commentary" section opines, among other things, that Plaintiff's "baby

was subjected to a fetal environment different than one the baby might have had, had Ms. Xiang

not been experiencing the greater anxiety triggered by the experiences of wrongful termination and a termination that caused the cessation of her medical insurance." *Id.* at ECF p. 15.  Dr. Frankel diagnosed Plaintiff with "PTSD Other specified trauma and stressor-related Disorder: Harassment, discrimination and wrongful loss of job," *id.*, based, in part, on her opinion that Plaintiff "experienced (direct experience) a trauma, being harassed and discriminated on an ongoing basis, creating a hostile working environment for her, feeling that she was regularly being threatened and feeling very vulnerable on her job," *id.* at ECF p. 16.  Dr. Frankel stated that Plaintiff's stressors underlying this diagnosis "were not life threatening but related to the discrimination, harassment and wrongful termination she experienced." *Id.* at ECF p. 17.  Dr. Frankel also diagnosed Plaintiff with Generalized Anxiety Disorder, *id.*; and Major Depressive Episode, Severe, *id.* at ECF p. 18.  Dr. Frankel concluded:

> It is my professional opinion as a Clinical Psychologist, with a reasonable degree of certainty, that there is a direct connection between Ms. Xiang's serious negative emotional experiences, experiences of a severe stress reaction including re-experiencing, avoidance and increased arousal and major depression, severe and her experiences of her harassment, discrimination and wrongful termination.

*Id.* at ECF p. 19.

Defendants move to preclude Dr. Frankel from offering an opinion into evidence.  Dr. Frankel is being offered to testify about Plaintiff's emotional distress claims and, according to Plaintiff, to help the jury "understand the complete extent of the emotional distress and psychological harm Defendants caused Plaintiff."  Dkt. No. 54 at 18.  Dr. Frankel's testimony would only be relevant to the distress suffered by Plaintiff following her termination and would have no bearing on whether Defendants had, in fact, discriminated against Plaintiff.  In light of the Court's conclusion that Defendant is entitled to summary judgment on all counts, it is unnecessary to decide whether Dr. Frankel's testimony would be admissible at trial.  The motion will therefore be denied as moot.

45

**CONCLUSION**

The motion for summary judgment is GRANTED.  The motion to preclude is DENIED as moot.

The Clerk of Court is respectfully directed to close Dkt. Nos. 42 and 45 and to close the case.

SO ORDERED.

Dated: March 15, 2022
      New York, New York

                                              LEWIS J. LIMAN
                                    United States District Judge